1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF FLORIDA
2                  MIAMI DIVISION

3        CIVIL ACTION NO:   97-2993-CIV-KING

4

5    MICHAEL CARUSO & CO., INC.,

6            Plaintiff,

7    vs.

8    ESTEFAN ENTERPRISES, INC. and
     BONGOS CUBAN CAFE, INC.,

9

10           Defendants.
     _____/

11                         255 Alhambra Circle
                           Suite 555
12                         Coral Gables, Florida
                           Wednesday, 10:05 a.m.
13                         January 7, 1998

14

15

16

17              **DEPOSITION OF DAN SAREL**

18

19

20

21       Taken on behalf of the Plaintiff before

22   Nancy Gilbert, RPR-CP, Notary Public in and for the

23   State of Florida at Large, pursuant to Notice of

24   Taking Deposition in the above cause.

25

ORIGINAL

2

```
 1    APPEARANCES:

 2         LOTT & FRIEDLAND, P.A., by
           DAVID K. FRIEDLAND, ESQUIRE
 3                 -and-
           GARY S. PHILLIPS, ESQUIRE
 4         Attorneys for Plaintiff

 5         HOLLAND & KNIGHT, by
           WILFREDO A. RODRIGUEZ, ESQUIRE
 6         VIVIAN RODRIGUEZ, ESQUIRE
           Attorneys for Defendants

 7

 8
```

| 9 | **WITNESS** | **EXAMINATION BY** | **PAGE** |
|---|---|---|---|
| 10 | DAN SAREL | Direct  Mr. Friedland | 3 |

11

| 12 | **SAREL DEPO EXHIBITS FOR IDENTIFICATION** | **PAGE** |
|---|---|---|
| 13 | 1 - Notice of Deposition | 5 |
|    | 2 - Curriculum Vitae - 12/19/97 | 9 |
| 14 | 3 - Curriculum Vitae - 8/19/97 | 9 |
|    | 4 - Brand Perceptions Study | 16 |
| 15 | 5 - Activities list | 20 |
|    | 6 - Page 352 from *Consumer Behavior* | 48 |
| 16 | 7 - Affidavit of Brian L. Kail | 52 |
|    | 8 - Interviewer Instructions | 60 |
| 17 | 9 - Interviewer Instructions w/signatures | 60 |
|    | 10 - 12/24/97 fax to R. Kent from D. Sarel | 60 |
| 18 | 11 - Log sheet | 60 |
|    | 12 - Questionnaire sheets ** | 72 |
| 19 | 13 - Codes | 72 |

```
20

21

22

23    (**Composite Ex. 12 was retained by Mr. Rodriguez)

24

25
```

1          (Thereupon, the following proceedings

2   were had out of the presence of Vivian Rodriguez,

3   Esquire:)

4   Thereupon:

5                    **DAN SAREL**

6   was called as a witness and, having been first duly

7   sworn and responding, "I do," was examined and

8   testified as follows:

9                **DIRECT EXAMINATION**

10  BY MR. FRIEDLAND:

11       Q.    Would you please state your full legal

12  name and address for the record?

13       A.    Dan D-a-n Sarel S-a-r-e-l, 10100

14  Southwest 142nd Street, Miami, Florida 33176.

15       Q.    Have you ever been deposed before?

16       A.    Yes.

17       Q.    How many times?

18       A.    A few times.  Not many.

19       Q.    When was the last time you were deposed?

20       A.    Probably three years ago.

21       Q.    What were the circumstances under which

22  you were deposed?

23       A.    It was a furniture case.  I don't

24  remember all the details.

25       Q.    Were you a party to the case?

4

1        A.      Party in what sense?

2        Q.      Were you sued or --

3        A.      No, no, I just testified as an expert.

4        Q.      On what issue did you testify?

5        A.      Similarity of furniture.

6        Q.      The design of the furniture?

7        A.      The design.  The look, basically.

8                I don't remember all the details.  It was

9        three years ago.

10       Q.      Who were the parties?

11       A.      I don't remember the names.

12       Q.      Do you remember who you were retained by?

13       A.      Yes, Holland & Knight.

14       Q.      How many times have you been retained by

15       Holland & Knight?

16       A.      Once or twice.

17       Q.      Is it once or twice?

18       A.      I don't remember.  I remember one case,

19       but it's possible that I have done five or six years

20       ago something else.  But definitely not more than

21       that.

22       Q.      Other than the furniture case and this

23       case today, do you recall being retained by Holland

24       & Knight any other time?

25       A.      I don't recall specifically, but I might

5

1    have once in the past.  That is why I said once or

2    twice.

3         Q.    Did you conduct a survey of any sort in

4    the furniture case?

5         A.    No.

6         Q.    Did you testify in court or at deposition

7    in that case?

8         A.    In court.

9         Q.    In Miami?

10        A.    Yes.

11        Q.    Did you work with Mr. Rodriguez on that

12   furniture case?

13        A.    No.

14        Q.    Which attorney at Holland & Knight did

15   you work with?

16        A.    Mr. --   What is it, Hamilton or --

17        Q.    Bill Hamilton?

18        A.    Bill Hamilton.

19             MR. FRIEDLAND:  Go ahead and mark this.

20             (Thereupon, the said document was marked

21   for identification as Sarel Deposition Exhibit

22   Number 1.)

23   BY MR. FRIEDLAND:

24        Q.    Dr. Sarel, I'm going to hand you what has

25   been marked as Exhibit 1 to today's deposition.

6

1           Have you ever seen that document before
2      or a copy thereof?
3           A.    Yes.
4           Q.    Do you understand you are appearing here
5      today as a result of my sending this notice to
6      Mr. Rodriguez?
7           A.    Yes, I do.
8           Q.    The third page of that document is a list
9      of documents that I asked you to produce today at
10     the deposition.
11          A.    Mm-hmm.
12          Q.    Do you see that?
13          A.    Mm-hmm.
14          Q.    Just prior --
15          A.    Exhibit A.
16          Q.    Yes, sir.
17                Just prior to our going on the record,
18     you provided me a box of documents.
19                Are there any documents in your
20     possession that I have not been provided?
21          A.    I don't believe so.
22                Again, I mean, I have a computer file of
23     the data that was processed.  So you have the
24     original questionnaire there.  So that is something
25     different and it is not included.

7

1          I used statistical programs to analyze

2    it.  It is not here.

3          Q.    But the results of your use of the

4    programs --

5          A.    Correct.

6          Q.    -- are contained in your report?

7          A.    Yes.

8          Q.    How many surveys have you conducted?

9          A.    In this case?

10         Q.    In your career.

11         A.    Hundreds.

12         Q.    How many of those surveys were in

13   trademark cases?

14         A.    Cases in terms of a legal case?

15         Q.    Well, other than legal cases, in what

16   situations have you conducted surveys?

17              MR. RODRIGUEZ:  Objection to the form.

18              THE WITNESS:  I have conducted many

19         surveys.  I mean, we conduct surveys on

20         consumer perception of specific brands.  In

21         that sense, it is a trademark, but in terms of

22         a legal case, I have not conducted surveys for

23         a legal case.

24   BY MR. FRIEDLAND:

25         Q.    Is this the first survey you have

LASER BOND FORM B   PENGAD · 1-800-631-6989

8

1    conducted in connection with a trademark

2    infringement litigation?

3         A.    Yes.

4         Q.    Is this the first survey you have

5    conducted in which you addressed the issue of the

6    likelihood of confusion?

7         A.    No.

8         Q.    How many times have you previously

9    conducted a survey regarding the issue of likelihood

10   of confusion?

11        A.    Again, not from a legal perspective, from

12   a marketing perspective, from a consumer perception

13   perspective I have done tens of studies like that.

14        Q.    Can you give me some examples of previous

15   surveys you have conducted?

16        A.    We conduct surveys like this all the

17   time.  It is part of the classes we teach in market

18   research and management.  We conduct studies on

19   consumer perception of differences of different

20   brands, perceptions of one store relative to other

21   stores.  We do it all the time.  This is nothing

22   unique or special.  Marketing is about consumer

23   perceptions and confusion.

24             MR. PHILLIPS:  I'm sorry, but could you

25        slow down just a little?

```
 1              THE WITNESS:  Sure.
 2    BY MR. FRIEDLAND:
 3        Q.    Prior to this case, have you been
 4    retained as an expert witness in a trademark
 5    infringement case?
 6        A.    I believe the case I referred to, the
 7    furniture case, was a trademark case.
 8        Q.    Do you recall which side Holland & Knight
 9    represented in that case, the plaintiff or the
10    defendant?
11        A.    I think they were the plaintiff.
12              MR. FRIEDLAND:  Let me have this marked
13         as Exhibit 2 and this as Exhibit 3.
14              (Thereupon, the said documents were
15    marked for identification as Sarel Deposition
16    Exhibit Number 2 and Exhibit Number 3.)
17    BY MR. FRIEDLAND:
18        Q.    In those situations where you have
19    conducted marketing, as opposed to legal surveys on
20    the issue of likelihood of confusion, how do you
21    generally conduct such a survey?
22              MR. RODRIGUEZ:  Objection to the form.
23              THE WITNESS:  There are many different
24         ways.
25              The typical way is a consumer survey,
```

1      and consumers are asked unaided questions, and

2      the format is somewhat similar to the one that

3      we saw in the survey I have conducted here.

4          Another way of conducting it, from time

5      to time we conduct experiments.

6  BY MR. FRIEDLAND:

7      Q.    What sort of an experiment would you

8  conduct?

9      A.    You may present people different objects

10  and try to interpret their perceptions, ask them

11  various association questions, what they understand,

12  what it means to them, things of that nature.

13      Q.    Did you conduct an experiment in this

14  particular case?

15      A.    No, I did not.

16      Q.    Why not?

17      A.    Because I didn't feel it was appropriate.

18      Q.    Why not?

19      A.    I felt the survey was much superior, and

20  it gave people the ability to think about and

21  associate anything that was related to this specific

22  brand logo.  And the key idea here was to make sure

23  that there is no aiding in any way to bias the

24  results.

25      Q.    To bias the results?

11

1          A.     Mm-hmm.

2          Q.     When you referred in your answer to this

3     particular brand logo, what are you referring to?

4          A.     The BONGOS CUBAN CAFE.

5          Q.     Let me show you Exhibits 2 and Exhibit 3.

6          A.     Mm-hmm.

7          Q.     I'll ask if you can identify these

8     documents for me?

9          A.     Yes, these are both my resumes.  One is

10    more updated since I had another publication since

11    that one, I believe.

12         Q.     Are these two different versions of your

13    C.V.?

14         A.     The only difference is one additional

15    article, that's it.  That's the only difference

16    between the two.

17         Q.     Could you show me on Exhibit 2, which is

18    the December 19th version of your C.V., which

19    article was added?

20         A.     The "Market Expansion Strategies" in the

21    *Health Care Business Digest*.

22         Q.     So the first entry on the third page of

23    your C.V.?

24         A.     Correct.

25         Q.     Okay.  How long have you been an

LASER BOND FORM B  PENGAD · 1-800-631-6989

12

1    associate professor at the University of Miami?

2         A.    I don't know where it says that.  Let me

3    see that.

4         Q.    Here (indicating).

5         A.    1983.

6         Q.    What are your current responsibilities as

7    an associate professor?

8         A.    I teach graduate classes in our regular

9    MBA class, in our executive MBA class, in our

10   executive nondegree classes.

11              I serve as a member of the marketing

12   department on the school council of the business

13   school.

14              I serve on various other committees, like

15   the Master's in Quality Management.

16        Q.    What classes do you teach in the regular

17   MBA program?

18        A.    I teach on a regular basis the basic core

19   Marketing Management Class, the Services Marketing,

20   Advertising and Management -- Advertising, Promotion

21   and Management.

22              In the past I have taught Consumer

23   Behavior, Market Research and various other classes.

24        Q.    What classes do you teach in the

25   executive MBA program?

1     A.    I teach the core MBA -- the core

2  marketing class.

3     Q.    How about in the executive nondegree

4  program?

5     A.    There are different programs, different

6  courses.  These are usually short courses dealing

7  with various issues, and it is topic specific.

8  These are one-day, two-day programs.

9     Q.    Can you give me some examples of the

10  different courses you have taught in the one or two

11  day programs?

12     A.    Sure, I have taught Health Care Marketing

13  and various advertising management classes.

14          The nondegree program is relatively new.

15  I taught similar courses in other programs that we

16  had before, but they all related to those issues of

17  marketing/advertising research.

18     Q.    In teaching the various courses that you

19  teach in the regular and executive MBA programs, do

20  you teach your students with respect to the issues

21  of trademarks in particular?

22          MR. RODRIGUEZ:  Objection to the form.

23          THE WITNESS:  We teach brand management.

24     In teaching brand management, we mention

25     trademark.  We focus on the importance of

14

1          brands, how to develop them, how to protect

2          them, but I don't emphasize the legal aspects.

3          We have other classes dealing with that.

4               We talk about the marketing management

5          issues.

6  BY MR. FRIEDLAND:

7     Q.   Do you teach the classes dealing with the

8  legal aspects?

9     A.   No, I do not.  We have a business law

10  department.

11     Q.   When you teach your students about

12  protecting brands, do you discuss any of the legal

13  aspects of trademarks?

14     A.   We mention it briefly, but that is not

15  the major part.

16          Protecting in terms of advertising

17  strategies, things of that nature, again, not from

18  the legal perspective.  We mention there are legal

19  issues and that they should pay attention to them,

20  but as I said, there is a business law department to

21  deal with that.

22     Q.   What is your understanding of what a

23  trademark is?

24          MR. RODRIGUEZ:  Objection to the form.

25          You can answer.

15

1          THE WITNESS:  Sure.  It is a mark that

2       identifies a brand that has legal protection.

3   BY MR. FRIEDLAND:

4       Q.    What sort of legal protection does it

5   have?

6          MR. RODRIGUEZ:  Objection to the form.

7          THE WITNESS:  It is registered and other

8       businesses cannot use it, cannot copy it.

9   BY MR. FRIEDLAND:

10      Q.    Did you conduct the survey in this case

11  in connection with your responsibilities as an

12  associate professor at the University of Miami?

13      A.    No.

14      Q.    Are you employed by a separate entity for

15  purposes of conducting such surveys?

16      A.    I'm self-employed.

17      Q.    Do you have any employees working for you

18  in connection with your independent marketing

19  efforts?

20          MR. RODRIGUEZ:  Objection to form.

21          THE WITNESS:  These are all contracted

22       employees, part-time for specific jobs.

23  BY MR. FRIEDLAND:

24      Q.    Did you contract any part-time employees

25  for this particular project?

16

1          A.     I had one.

2          Q.     Who was that?

3          A.     Her name is H-u-i, last name C-a-o.  Also

4    known as Becky.

5               MR. PHILLIPS:  Of course.

6               MR. RODRIGUEZ:  I knew that.

7               THE WITNESS:  I also hired a market

8          research firm to do the job, but these are not

9          employees.

10              (Discussion off the record.)

11              MR. FRIEDLAND:  Mark this as the next

12         exhibit.

13              (Thereupon, the said document was marked

14   for identification as Sarel Deposition Exhibit

15   Number 4.)

16   BY MR. FRIEDLAND:

17         Q.     Dr. Sarel, when you have previously

18   conducted consumer perception surveys, have they

19   provided you information regarding a likelihood of

20   confusion in a trademark infringement setting?

21         A.     What do you mean, in a certain legal

22   case?

23         Q.     Well, do they provide you information as

24   to whether there is a likelihood of confusion as

25   between two particular brands?

17

1      A.     Sure.

2             MR. RODRIGUEZ:  Objection to form.

3    BY MR. FRIEDLAND:

4      Q.     In what way?

5      A.     If consumers associate one with the

6    other, there is a likelihood of confusion.

7      Q.     Do you know what the legal test of

8    likelihood of confusion is in a trademark

9    infringement case?

10             MR. RODRIGUEZ:  Object to form.

11             THE WITNESS:  I saw the documents.

12         There are a variety of criteria.

13    BY MR. FRIEDLAND:

14      Q.     What documents did you see?

15      A.     All of those documents that you see here

16    (indicating).

17             MR. RODRIGUEZ:  For the record,

18         referring to the documents he brought or part

19         of the documents he brought in response to the

20         subpoena.

21    BY MR. FRIEDLAND:

22      Q.     Are you referring to the various

23    memoranda that have been filed by the parties in

24    this case --

25      A.     Correct.

18

1        Q.    -- with respect to the preliminary

2    injunction motion?

3        A.    Correct.

4        Q.    Did you conduct any independent research

5    regarding the test of likelihood of confusion in a

6    trademark infringement case?

7             MR. RODRIGUEZ:  From a legal

8        perspective?

9             THE WITNESS:  Repeat the question.

10   BY MR. FRIEDLAND:

11       Q.    Did you conduct any independent research,

12   separate and apart from reading the papers that

13   Mr. Rodriguez' office provided you, regarding the

14   test, the legal test of a likelihood of confusion in

15   a trademark infringement case?

16            MR. RODRIGUEZ:  Objection to form.

17            THE WITNESS:  I don't know what the

18       research means, but in terms of preparation

19       for this, I looked at McCarthy, but again, not

20       from a legal perspective but from a marketing

21       perspective.  I was not interested in the

22       legal issue.

23   BY MR. FRIEDLAND:

24       Q.    Why are you not interested in the legal

25   issue?

19

1      A.      Because I'm not a legal expert.  I was

2   interested in consumer perception and making sure

3   that I followed the procedures that are recommended.

4            I read it, but it is not my area of

5   expertise, and I --

6      Q.      Did you read any of the cases cited in

7   the various memoranda?

8      A.      No.

9      Q.      What is your understanding, from a legal

10   perspective, of which consumers' perceptions are

11   relevant in determining the likelihood of confusion?

12            MR. RODRIGUEZ:  Objection to form.

13            THE WITNESS:  Both consumers, consumers

14      of the plaintiff and consumers of defendants.

15   BY MR. FRIEDLAND:

16      Q.      When were you first contacted by Holland

17   & Knight in connection with this case?

18      A.      I was contacted by attorney

19   Vivian Rodriguez, I don't remember the exact date,

20   but about the third week of November.

21            Then I was asked to send a resume, which

22   I did, and then I didn't hear from them until, I

23   think it is the 11th.  I have a page here in front

24   of you that --

25            May I use it?

20

1          MR. FRIEDLAND:  Sure.  Let me go ahead

2      and mark this as Exhibit 5.

3          (Thereupon, the said document was marked

4    for identification as Sarel Deposition Exhibit

5    Number 5.)

6    BY MR. FRIEDLAND:

7      Q.   Before you use it, can you just identify

8    this document for us for the record?

9      A.   Yeah, these are a list of activities and

10   the dates when they have been conducted.

11          I had been contacted by Mr. Rodriguez on

12   the 11th of December.  That's the first time that we

13   discussed details.

14     Q.   When Ms. Vivian Rodriguez contacted you

15   around the third week of November, what information

16   did she provide you with regard to this case?

17     A.   Very general.  She asked me if I heard

18   about BONGOS CUBAN CAFE, and there is a trademark, a

19   potential trademark case and was I interested.

20          I indicated I might be.

21          She asked me to send a resume, and she

22   said she has to distribute this resume to other

23   attorneys, and they will get back to me.

24     Q.   And the next you heard from Holland &

25   Knight was from Mr. Rodriguez --

1       A.      Correct.

2       Q.      -- on the 11th of December?

3       A.      Correct.

4       Q.      What did you discuss with Mr. Rodriguez

5    on the 11th of December?

6       A.      He described the details of the case and

7    gave me a brief description of the issues at hand,

8    and he asked some questions about my background, my

9    interest in the case.

10           We discussed financial arrangements.  And

11   he indicated that he's going to hire me as a

12   consultant to Holland & Knight in this specific case

13   on marketing issues, and he said he was going to

14   send me documents, which I received the next day,

15   and you see them here (indicating).

16      Q.      What details did Mr. Rodriguez provide

17   you about the case in this December 11th

18   conversation?

19      A.      I don't recall every detail specifically,

20   but he gave a general description of what BONGOS

21   CUBAN CAFE was, what kind of entity it was, and he

22   mentioned -- he discussed the plaintiff, in terms of

23   what kind of a company it is, and that they are

24   suing BONGOS CUBAN CAFE.

25      Q.      What kind of company did he tell you the

```
 1    plaintiff is?
 2          A.    A manufacturer of clothing, mainly jeans,
 3    distributed in various department stores in the
 4    United -- around the country.
 5                I don't remember verbatim exactly,
 6    because I have been involved in this since then.  So
 7    I don't recall every detail specifically.
 8          Q.    Your December 11th entry, after listing
 9    that you were contacted, I assume that "FR" is
10    referring to Mr. Rodriguez?
11          A.    Right.
12          Q.    And it lists what I think is what I'm
13    reading as an Internet search?
14          A.    Correct.
15          Q.    Did you conduct an Internet search on the
16    11th?
17          A.    I just looked --  The answer is yes.  I
18    looked in the Internet just to get an idea of BONGOS
19    CUBAN CAFE and BONGO JEANS, and to see if there are
20    other bongos, just to become familiar.
21          Q.    Did you find any other bongos?
22          A.    Quite a few.
23          Q.    Any other restaurants?
24          A.    Yes.
25          Q.    Any other clothing manufacturers?
```

23

1    A.    Not that I recall.

2          And this was not an extensive search.  I

3    just looked to become familiar.

4    Q.    Did Mr. Rodriguez at any time or did his

5    office provide you samples of my client's clothing

6    products?

7    A.    Yes.

8    Q.    Where are those samples today?

9    A.    I don't have them.  Mr. Rodriguez has

10   them, I guess.

11   Q.    Did you return them to his office?

12   A.    Yeah, he came to my office and showed me

13   merchandise of what was both BONGOS CUBAN CAFE and

14   your client, and we looked at them and he took them

15   back.

16   Q.    Which date on this activities list,

17   Exhibit 5, did that occur?

18   A.    Yesterday.  But I've seen the merchandise

19   before.

20   Q.    When had you seen the merchandise before?

21   A.    I don't remember the date, but when I

22   visited Burdines.

23   Q.    You saw which party's merchandise at

24   Burdines?

25   A.    Your client's.

24

```
 1        Q.    When did you first see Mr. Rodriguez'
 2   client's merchandise?
 3             MR. RODRIGUEZ:  Are you talking about
 4        physical merchandise or --
 5             MR. FRIEDLAND:  Physical merchandise.
 6             THE WITNESS:  Physical merchandise
 7        yesterday, but I have seen pictures before.
 8   BY MR. FRIEDLAND:
 9        Q.    Have you ever been to BONGOS CUBAN CAFE?
10        A.    No.
11             (Thereupon, Vivian Rodriguez, Esquire
12   entered the room, after which the following
13   proceedings were had:)
14             (Discussion off the record.)
15   BY MR. FRIEDLAND:
16        Q.    How many times have you met in person
17   with Mr. Rodriguez in connection with this matter?
18        A.    In person?
19        Q.    Yes.
20        A.    Once.
21        Q.    That was yesterday?
22        A.    Correct.
23        Q.    Did you ask Mr. Rodriguez --
24        A.    Yesterday?  No, it wasn't yesterday.  I'm
25   sorry.  The dates --  It was Monday.  I'm sorry.
```

25

1      Q.    Monday?

2      A.    Monday.  The other thing was Monday too.

3   Whatever it states there.  Yesterday was on the

4   phone.  I met on Monday.

5      Q.    Did you ask Mr. Rodriguez to bring my

6   client's clothing products to the meeting?

7      A.    Did I ask specifically?  No.

8      Q.    Do you know why he brought them?

9          MR. RODRIGUEZ:  Objection to form.

10         THE WITNESS:  To show me the real

11     samples of the merchandise.

12  BY MR. FRIEDLAND:

13     Q.    Why did you visit Burdines?

14     A.    To get a feel for the merchandise, the

15  positioning, the marketing intent, the location in

16  the store.

17     Q.    What is your impression of the marketing

18  intent of my client's merchandise?

19     A.    It is positioned as a young women's,

20  junior's type of clothing, and as an all-American

21  brand.

22     Q.    What is your impression of the marketing

23  intent of Mr. Rodriguez' clients?

24     A.    Their intention is to position themselves

25  as a Cuban-oriented restaurant and entertainment

    1   business.   Mainly restaurant.

    2        Q.     Mainly restaurant?

    3        A.     Mm-hmm.

    4        Q.     But they do sell clothing merchandise?

    5        A.     (Witness nodding head.)

    6               MR. RODRIGUEZ:   Objection to the form.

    7   BY MR. FRIEDLAND:

    8        Q.     Correct?

    9        A.     They are clearly selling clothing in the

   10   gift shop, yes.

   11        Q.     What is Cuban oriented about their gift

   12   shop?

   13        A.     Well, they hold a core, based on the

   14   video that I've seen, the merchandise has the theme

   15   of the man playing the bongos and the woman dancing.

   16   So it's the atmosphere there and the merchandise,

   17   and the logos on the merchandise.

   18        Q.     The placement of the logos on the

   19   merchandise is what gives it the Cuban theme?

   20        A.     No, not the placement.   The look.   The

   21   specific element that I mentioned, like the dress of

   22   the man and the woman I described.

   23        Q.     The man and woman are part of the logo or

   24   logos utilized by the defendants?

   25        A.     I'm sorry?

1        Q.    The man and woman are part of the logos
2    utilized by the defendants?
3        A.    Part of two of the logos, yes.
4        Q.    Is there anything Cuban oriented about
5    the clothing products sold by the defendants
6    separate and apart from the logos?
7        A.    Not that I have seen.
8        Q.    Is there anything Cuban oriented about a
9    denim jeans jacket?
10       A.    No.
11       Q.    About a T-shirt?
12       A.    Not the T-shirt itself.  The logo is the
13   one that creates the differentiation.
14       Q.    What about my client's products gives you
15   the impression that it is an all-American brand?
16       A.    In many of the labels on the ads, it
17   states it.
18       Q.    What ads have you seen?
19       A.    The ones that are included in these
20   positions or pleadings here.
21       Q.    Have you seen any ads independent of the
22   documents provided to you by Mr. Rodriguez?
23       A.    For your client?
24       Q.    For my client's products?
25       A.    No.  I have seen one for BONGOS CUBAN

1    CAFE.

2         Q.    Where did you see that?

3         A.    I saw it in The Miami Herald advertising

4    for the New Year's activities in BONGOS CUBAN CAFE.

5    I believe it was the weekend section.

6         Q.    When you had your December 11th

7    discussion with Mr. Rodriguez, did he advise you

8    whether or not my client owned my federal trademark

9    registrations?

10        A.    I don't recall.

11        Q.    Do you have an understanding today as to

12   whether my client owns any federal trademark

13   registrations?

14        A.    Yes, I believe it does.

15        Q.    You believe it does?  Okay.

16             What are the financial arrangements that

17   you have entered into with Holland & Knight?

18             MR. RODRIGUEZ:  Objection to the form.

19             You can go ahead.

20             THE WITNESS:  I have been retained as a

21        consultant on an hourly basis, and I was paid

22        separately for the project that I conducted, a

23        lump sum.

24   BY MR. FRIEDLAND:

25        Q.    The project being the survey in Orlando?

1          A.     Right.

2          Q.     What was the lump sum for the Orlando

3     project?

4          A.     It is --   I think it turned out to be

5     16,500 and change.

6          Q.     Does that include any moneys you would

7     have had to pay to the Orlando market research

8     company?

9          A.     Yes, this is the total sum.   That's the

10    total amount.

11         Q.     What hourly rate are you being paid as a

12    consultant?

13         A.     350.

14         Q.     Your activities list, which is Exhibit 5,

15    indicates December 16th, a subsequent telephone

16    conference with Mr. Rodriguez?

17         A.     Correct.

18         Q.     Do you recall what you discussed during

19    that conversation?

20         A.     Yes, I discussed the findings based on

21    all the material that he provided me.  I spent quite

22    a bit of time reviewing it, so I discussed my

23    impressions.

24         Q.     What were your impressions?

25         A.     That there is no likelihood of confusion.

1      Q.     What was the basis for that impression?

2      A.     Well, all the information that was

3   provided indicates that BONGOS CUBAN CAFE is a Cuban

4   restaurant, that is the approach, that's the theme.

5   The logo communicates it, the ethnic dress, the man,

6   the woman we have discussed before, whereas your

7   client is an all-American jeans type company.

8          So, the overall experience, the

9   perceptions the consumers are getting from being

10  exposed to these two very different situations are

11  clearly different, one is a clothing, all-American

12  situation, the other one is a Cuban restaurant.

13         The second major issue here is the

14  clients' and/or target markets are quite different.

15  Cuban Bongos Cafe -- sorry -- BONGOS CUBAN CAFE is a

16  family-oriented business appealing to a cross

17  section of consumers, whereas your client has

18  primarily targeted juniors.

19         The advertising approaches are quite

20  different, both in terms of theme and specific

21  channels of advertising.

22         The channels of distributions are

23  completely different.  One is in a restaurant, the

24  gift shop is being associated with and part of the

25  restaurant.  The other one is traditional department

1    stores and specialty stores, mainly in malls.

2              So overall we are dealing with very

3    different entities.  Additionally, your brand is I'm

4    sure a recognized brand, but a relatively -- I won't

5    say weak -- but not a very strong brand.  And when

6    you indicate the name, consumers in general would

7    have a direct idea of what you are talking about and

8    which product or product categories we're dealing

9    with.

10             So that's the general gist of the

11   information I gleaned from reading all these

12   materials.

13             MR. FRIEDLAND:  Could you read back the

14        last portion of the response, where he said he

15        doesn't want to say weak, but --

16             (Thereupon, the portion referred to was

17   read by the reporter as above recorded.)

18   BY MR. FRIEDLAND:

19        Q.   Did you conduct any studies to determine

20   whether consumers recognize my client's brand?

21        A.   No, I did not.

22        Q.   So you are just assuming that it is a

23   weak name?

24             MR. RODRIGUEZ:  Objection to the form.

25             THE WITNESS:  It is not assuming.  I

32

1    have expertise in marketing for 20 years or

2    over 20 years, and I said the brand is

3    recognized but it is recognized within a

4    specific target or niche in the market, and it

5    is clearly not a widely-known brand based on

6    the information I had.

7         Did I make this decision only on the

8    16th of December, or was it reinforced by the

9    survey that I have conducted?  It is difficult

10   to tell at this time, because obviously my

11   opinions have been reinforced by the survey we

12   have conducted.

13   BY MR. FRIEDLAND:

14        Q.   When you had your December 16th

15   discussion with Mr. Rodriguez, did you give him all

16   the detail that you just provided in your answer, or

17   did you generally summarize that you felt there was

18   no likelihood of confusion?

19        A.   No, we discussed the details.  I don't

20   remember word by word what we said, but we discussed

21   the issues.

22        Q.   Have you ever provided an opinion on the

23   issue of likelihood of confusion in a trademark

24   infringement matter before?

25             MR. RODRIGUEZ:  Objection, asked and

33

1       answered.

2              THE WITNESS:  I mentioned, I think, the

3       case of the furniture, but it wasn't --  Yeah,

4       the furniture that I discussed, but other than

5       that, I can't remember.

6   BY MR. FRIEDLAND:

7       Q.    What were the trademarks involved in that

8   case?

9              MR. RODRIGUEZ:  Objection to form.

10             THE WITNESS:  As I said before, I don't

11      remember the specifics.

12  BY MR. FRIEDLAND:

13      Q.    Were there trademarks involved in that

14  case?

15      A.    I believe the plaintiff had one.

16      Q.    Your activities list, Exhibit Number 5,

17  has a entry on December 18th, it states "MR firm

18  contacts."  Do you see that?

19      A.    Market research firm contact.

20      Q.    Which market research firm did you

21  contact on the 18th of December?

22      A.    Barbara Nolan Market Research.

23      Q.    Is that the firm you ultimately retained?

24      A.    Correct.

25      Q.    How much did they charge you for their

1  work on this project?

2      A.    It is not finalized.  I haven't received

3  a final bill yet.

4      Q.    Did they provide you an estimate?

5      A.    Yeah, they charge basically $20 an hour

6  per person, including training.  They had six people

7  involved in the process.  They had a supervisor

8  involved.

9            So, as I said, I haven't received the

10  final bill yet.

11      Q.    Have you utilized that firm's services in

12  the past?

13      A.    Years ago, but I have known about them

14  for many years.

15      Q.    You have known about them?

16      A.    I have known about them for many years.

17  They have been in business for over 25 years.

18      Q.    When did you first discuss with

19  Mr. Rodriguez or Holland & Knight the concept of

20  conducting a survey in this case?

21      A.    I believe the 16th.

22      Q.    Did you recommend that a survey be

23  conducted?

24      A.    I suggested it, yes.

25      Q.    Your notes indicate on December 22nd the

1    approval of the survey and library search?

2         A.    Yes.

3         Q.    Do you see that?

4         A.    Yes.

5         Q.    What is the reference to the library

6    search?

7         A.    The library search was my reference

8    earlier to the fact that I went to the law library

9    to look at McCarthy to see some suggestions how to

10   conduct surveys in trademark cases.

11        Q.    How did you know to look at McCarthy?

12        A.    I read the material that you -- all of

13   this material.  McCarthy was mentioned many times.

14        Q.    Had you ever reviewed Professor

15   McCarthy's books before this case?

16        A.    No.

17        Q.    Why did you suggest to Mr. Rodriguez on

18   the 16th of December that a survey be conducted?

19             MR. RODRIGUEZ:  Objection to form.

20             THE WITNESS:  Because I felt this was

21        the best way to document the situation, to

22        find out if there is confusion or not.

23             Opinions are obviously good and strong,

24        but we are dealing with consumers here, so if

25        you can talk to the consumer you can get the

36

1      final perspective.

2  BY MR. FRIEDLAND:

3      Q.    Did Mr. Rodriguez authorize you to

4  conduct a survey on the 16th?

5      A.    No, he did not.

6      Q.    Did he ultimately authorize you to

7  conduct a survey?

8      A.    Yes.

9      Q.    When?

10     A.    The 22nd, I believe.  And then the

11  library research I did after it was approved.  So

12  the 22nd, actually it was.

13         I proposed it on the 18th, I believe.

14  Yeah, on the 18th.  And I got the approval on the

15  22nd.  That's when I went to the library.

16     Q.    Your activities list, Exhibit 5, notes on

17  the 23rd of December "survey design"?

18     A.    Correct.

19     Q.    Who designed the survey?

20     A.    I designed the survey.

21     Q.    Did you have any input from anybody else?

22     A.    No.

23     Q.    Who made the decision to conduct the

24  survey at Mr. Rodriguez' client's restaurant?

25     A.    I have no idea.

37

1          In terms of input, input in the design of

2     the survey, I designed the survey completely myself.

3     After I have designed it, I sent a copy to -- I

4     faxed a copy to Holland & Knight, but they were not

5     involved in the design of the survey.

6          Q.    Is among these documents the survey that

7     you faxed to Holland & Knight?

8          A.    No, this is the final survey.

9          Q.    Where are the drafts?

10         A.    I don't have drafts.

11         Q.    Well, what did you fax to Holland &

12    Knight?

13         A.    I don't have the document that I faxed to

14    Holland & Knight.

15         Q.    You threw it out?

16         A.    Yeah, because basically it was very

17    similar to what I had before.  I was working on the

18    computer, and I was updating it as I went along.

19          The fax is from the computer to a fax.

20         Q.    I'll ask the same question that I asked

21    that wasn't answered.

22          Who made the decision to conduct the

23    survey at Mr. Rodriguez' client's restaurant?

24          MR. RODRIGUEZ:  Objection, asked and

25          answered.

38

1          THE WITNESS:  I don't know who.  I got

2     the approval to go ahead with the survey.  Who

3     approved it, if the client approved it or --

4          I assume the client approved those

5     things.  I have no idea.

6   BY MR. FRIEDLAND:

7     Q.    Let me ask it again.

8          I'm not asking who approved the survey in

9   general.  I'm asking who approved that it be

10  conducted at BONGOS CUBAN CAFE?

11         MR. RODRIGUEZ:  That's a different

12    question.

13         THE WITNESS:  It was not a question of

14    approval.  I basically suggested that that's

15    the way it should be done, and no one

16    discussed that issue.

17  BY MR. FRIEDLAND:

18    Q.    Did you consider conducting a survey at

19  any other locations?

20    A.    No.  I considered it, but basically I

21  decided not to.

22    Q.    What other locations did you consider?

23    A.    I thought about the general idea, what

24  would be the best way of doing it.  So it is an

25  issue of what "consider" is.

39

1          Any study that you think about, you would

2     define the study, define the objectives and start

3     thinking about where can you do it.  You can do it

4     on the moon too.  If this is a consideration, that

5     is a possibility.

6          Q.    Did you consider doing on it the moon?

7          A.    Absolutely, from that perspective, yes.

8          But it was very clear that the right

9     location to do the study of BONGOS CUBAN CAFE's

10    customers was at BONGOS CUBAN CAFE, given the

11    likelihood of finding them there and that the

12    respondents were qualified.

13         Any other approach which could be done

14    would be inefficient.

15         Q.    Are BONGOS CUBAN CAFE customers the only

16    relevant customers in determining likelihood of

17    confusion?

18         A.    No.

19         Q.    So your survey only looked at a portion

20    of the relevant customer base?

21              MR. RODRIGUEZ:  Objection to the form.

22              THE WITNESS:  Not necessarily.

23    BY MR. FRIEDLAND:

24         Q.    Why not?

25         A.    Because the survey was of the customers

40

1  of BONGOS CUBAN CAFE, which is a cross section of

2  the U.S. population.  You can assume that some of

3  those people would be BONGO clothing's, your

4  client's customers.

5       Q.   Did you ask your survey respondents if

6  they were BONGO customers?

7       A.   No, I did not.

8       Q.   How do you know your survey is of a cross

9  section of the United States?

10      A.   I know it from the distribution of

11  results, that we got 75 percent of the people as

12  visitors.  I also know from the information that

13  Disney provided, that they felt this time of year

14  was their most representative of the U.S.

15  population, because they get people from all over.

16      Q.   You have testified that one of the

17  reasons you felt there was no likelihood of

18  confusion was the difference in the themes of the

19  two companies, namely that Mr. Rodriguez' client is

20  a Cuban-themed restaurant, while my client is an

21  all-American company, correct?

22      A.   Correct.

23      Q.   Did you, as part of your survey,

24  determine whether your respondents were Latin versus

25  non-Latin?

1        A.      No, we did not.

2        Q.      Why not?

3        A.      I didn't feel it was relevant.

4        Q.      Why not?

5        A.      Because we tried to take a cross section.

6    We were not trying to locate a different segment,

7    whether they were Latin or not Latin.

8            Actually, there were, again, a few people

9    that did not participate in the survey because they

10   only spoke Spanish.  So the survey, if it is

11   over-representing, it is over-representing the Anglo

12   population.

13       Q.      Would questionnaires be available for

14   those that only spoke Spanish?

15       A.      No.

16       Q.      How do you know that then?

17       A.      How do I know what?

18       Q.      How do you know that people --

19       A.      I know by inference.  I know by inference

20   that the several respondents cited -- that

21   respondents who participated that spoke both English

22   and Spanish indicated, oh, I'm sure that I know

23   about Gloria Estefan, that's why I'm here, these

24   type of things.  So I don't know it for a fact, but

25   by inference.

42

1       Q.    By inference that your interviewers, the

2   market research company's interviewers approached

3   potential respondents who spoke only Spanish?

4       A.    No, I did not say that.

5             I said by inference that those that are

6   Latin are more likely to associate the BONGOS CUBAN

7   CAFE was a Latin theme with Gloria Estefan, but we

8   did not study those that only spoke Spanish.

9       Q.    You mentioned that Disney had provided

10  you information that this was the best time of year,

11  I believe, to get a cross section, and I may have

12  mischaracterized that.  What information did you get

13  from Disney specifically?

14      A.    I spoke with the market research

15  department about --  They are very strict about

16  conducting surveys there, and they mentioned a

17  variety of things in terms of codes, and what they

18  should do, and what the interviewers should do, and

19  things of that nature.

20            Also, I heard from Mr. Rodriguez.  He

21  spoke to the legal department, and they told him it

22  was the best time of year to conduct that.

23      Q.    Did you exchange in any correspondence

24  with Disney?

25      A.    No.

43

1      Q.    Did you speak with anyone on the

2 telephone at Disney?

3      A.    Yes, I did.

4      Q.    Who did you speak with?

5      A.    I don't remember his name.

6      Q.    Where would that fall on your activities

7 list?

8      A.    It would fall the day that -- on the

9 24th.

10     Q.    Under implementation?

11     A.    I don't know if it says implementation.

12     Q.    I think it says survey --

13     A.    On the morning of the 24th, I had a

14 discussion with the market research department, and

15 I think there was a call to the legal department.

16 They had to approve the survey.  So, yes, that's the

17 24th.

18     Q.    So on December 24th, the reference to

19 survey approval is not a reference to Mr. Rodriguez,

20 but rather approval by Disney?

21     A.    It is a combination of both

22 Mr. Rodriguez, who said fine, and mainly Disney,

23 yes.

24     Q.    Well, December 22 you also have --

25     A.    No, this is approval --  The approval

44

1    here means the go ahead to do the survey.

2         Q.    On the 22nd?

3         A.    Correct.

4         Q.    Okay.

5         A.    The 24th is the specific survey format

6    and the instructions of how to go about doing it.

7         Q.    When you previously testified that you

8    faxed Mr. Rodriguez a draft of the survey, were you

9    referring to the questionnaire?

10        A.    Yes.

11        Q.    What about the instructions that you

12   provided to the Orlando market research firm?

13        A.    Did I fax it to Mr. Rodriguez?

14        Q.    Yes.

15        A.    No, I did not.

16        Q.    Did you prepare those?

17        A.    Yes.

18        Q.    Were they approved by anyone?

19        A.    No.

20        Q.    Did you travel to Orlando in connection

21   with the survey?

22        A.    No, I did not.

23              (Discussion off the record.)

24   BY MR. FRIEDLAND:

25        Q.    When you spoke with Mr. Rodriguez, I

1    guess going back to the 11th, and he told you he

2    wanted to hire you as a consultant, what did he

3    specifically ask you to do?

4              MR. RODRIGUEZ:  Objection, asked and

5         answered.

6              THE WITNESS:  He asked me to review the

7         documents and tell him what I thought about

8         it.

9    BY MR. FRIEDLAND:

10        Q.    On December 11th there was no discussion

11   of a possible survey?

12        A.    I don't think so.

13        Q.    How many hours did you spend reviewing

14   the documents?

15        A.    Approximately 15, 16.

16        Q.    Did Mr. Rodriguez specifically request

17   that you provide him your impressions on the issue

18   of likelihood of confusion?

19             MR. RODRIGUEZ:  Objection to form.

20             THE WITNESS:  I assume he did.  You mean

21        on the 11th?

22   BY MR. FRIEDLAND:

23        Q.    Yes.  When he hired you.

24        A.    He asked me, yeah, I believe so.

25        Q.    Did he ask you for your impressions on

46

1      any other issues?

2          A.      They were all related.  I was to look at

3      information, to analyze it, to talk about the

4      likelihood of confusion, the similarities and

5      differences between the two marks.

6          Q.      When you talk about the similarities of

7      the marks, what particular marks are you talking

8      about?

9          A.      I'm talking about the BONGOS CUBAN CAFE,

10     the three marks that they are using, and the various

11     marks that your client is using as shown in these

12     materials.

13         Q.      Let me show you what has been marked as

14     Exhibit 4 and ask you to identify that for me.

15         A.      Yeah, that's the report of the survey

16     we've conducted.

17         Q.      Have you ever been to Walt Disney World?

18         A.      Yes.

19         Q.      When were you last there?

20         A.      A couple years ago.

21         Q.      Have you ever been to the Disney Village?

22                 Do you know what the Disney Village is?

23         A.      Yeah, I know what it is.  If I have been

24     there, I don't remember.

25                 I haven't been there for a couple of

47

1    years.

2         Q.    When did you prepare the report which is

3    identified as Exhibit 4 to your deposition?

4         A.    On Saturday and Sunday, whatever the

5    dates were.  The 3rd, the 4th, and it was ready on

6    the 5th.

7               You meant prepare?  I mean, I have worked

8    at it for a couple of days, the actual writing of

9    the report.

10        Q.    Is this the only version of the report

11   that you provided to Mr. Rodriguez?

12        A.    Absolutely.

13        Q.    When did you first communicate to

14   Mr. Rodriguez your impressions of the results of the

15   survey?

16        A.    When I handed him the report on the 5th.

17        Q.    Who decided to conduct the survey over a

18   three day period of time?

19        A.    I decided.

20        Q.    Who selected the three days upon which

21   the survey was conducted?

22        A.    I did.

23        Q.    Subsequent to the December 16th telephone

24   conversation with Mr. Rodriguez, when did you next

25   speak with him?

48

1          MR. RODRIGUEZ:  Objection, asked and

2     answered.

3          THE WITNESS:  I don't recall if I spoke

4     with him on the 18th.  He was out of town

5     maybe.  So I don't remember specifically.

6          I spoke to him on the 23rd and the 24th.

7          MR. FRIEDLAND:  Mark that.

8          (Thereupon, the said document was marked

9     for identification as Sarel Deposition Exhibit

10    Number 6.)

11          (Discussion off the record.)

12    BY MR. FRIEDLAND:

13    Q.    Do you know who Ivan Ross is?

14    A.    Yeah, I know the name.

15    Q.    In what context do you know the name?

16    A.    I hope we are referring to the same

17    Ivan Ross.  There is a professor of marketing called

18    Ivan Ross.

19    Q.    Where is he a professor of marketing?

20    A.    I don't remember.  I know the name from

21    the literature.

22    Q.    From?

23    A.    From the literature.

24    Q.    What literature?

25    A.    Marketing literature.

1            If there is another Ivan Ross, then we're
2      talking about another person that I don't know.
3            Q.    Let me show you what has been marked as
4      Exhibit 6, which is one of the documents provided to
5      me in the box this morning.
6            A.    Okay.
7            Q.    Dr. Sarel, could you identify Exhibit 6
8      for me?
9            A.    Yeah, it's a copy from a textbook by
10     Hoyer & MacInnis called *Consumer Behavior* that was
11     published in 1997.  I didn't want to carry the whole
12     book.  It was heavy.
13           Q.    Why was this document amongst the
14     documents you brought to me today?
15           A.    Because I was looking at some information
16     about teenagers' perceptions and importance of
17     clothing and how fashion oriented they are, and the
18     symbolism of fashion for kids and teenagers.
19                 So this was just to --   Since I was
20     asked to bring everything, I looked at that book, so
21     I brought it with me, a copy of it.
22           Q.    The textual portion of Exhibit 6 includes
23     an area marked in ink with an arrow to the left of
24     it?
25           A.    Correct.

PENGAD • 1-800-631-6989   LASER BOND FORM B

50

1     Q.    Is that your marking?

2     A.    Yes.

3     Q.    Why did you mark that particular section?

4     A.    Because I thought that particular part

5    was relevant to the case.

6     Q.    To the what?

7     A.    To the case we're dealing with.

8     Q.    Did you use this material in connection

9    with your preparation of this survey?

10    A.    No.  No, this is not related to the

11   survey.  It just was part of the --

12    Q.    Part of what?

13    A.    No, I just put it together with the clip.

14   This has nothing to do with the survey.  This is not

15   part of the survey.

16    Q.    What is the source of your understanding

17   regarding to whom my client markets its products?

18    A.    The source?

19    Q.    Yes.

20    A.    I read the material that we referred to

21   before, the advertising that I have seen, the visit

22   to Burdines.  And one thing that is actually not

23   mentioned on this list is a discussion with an

24   advertising executive.  That is not on that list.

25    Q.    Not on your activities list?

1          A.      Right.

2          Q.      With what advertising executive?

3          A.      This is the director for fashion

4     advertising in *Vanity Fair*.

5          Q.      Who is that?

6          A.      Tova T-o-v-a Bonem B-o-n-e-m.

7          Q.      When did you speak with Ms. Bonem?

8          A.      Ms.

9          Q.      Okay.

10         A.      Let me see.  I believe it was on the --

11    around the 18th.

12         Q.      Can you summarize the substance of your

13    discussion with Ms. Bonem?

14         A.      I asked her if she heard about BONGO

15    JEANS.  I asked her to indicate who she felt their

16    target market was.  I asked her to indicate in

17    general what is common right now for similar

18    advertisers in terms of advertising budgets.  These

19    type of issues.

20         Q.      How did you come to speak with Ms. Bonem?

21         A.      She's my sister.

22         Q.      Okay.  Prior to being contacted by

23    Vivian Rodriguez around the third week of November,

24    had you heard of my client?

25         A.      No.

52

1      Q.    Had you heard of BONGOS CUBAN CAFE?

2      A.    No.

3      Q.    I'm going to show you one of the

4   documents I have pulled from this stack, which is

5   entitled the Affidavit of Brian L. Kail K-a-i-l.

6            MR. RODRIGUEZ:   Are you marking this?

7            MR. FRIEDLAND:   I just want to see if he

8        has read it.

9            THE WITNESS:   Yes, I did.

10           MR. FRIEDLAND:   Okay.   Then I'll go

11       ahead and mark it.

12           (Thereupon, the said document was marked

13   for identification as Sarel Deposition Exhibit

14   Number 7.)

15   BY MR. FRIEDLAND:

16      Q.    Dr. Sarel, I'm going to hand you a six

17   page document marked as Exhibit 7, which is the

18   first six pages of the affidavit of Brian L. Kail.

19   I will represent to you it is not the entire

20   document that was filed with the Court.

21           MR. RODRIGUEZ:   Do you represent that

22       you have looked at everything else and it is

23       not in here?

24           MR. FRIEDLAND:   I'll be happy to look at

25       the rest it.

53

1        MR. RODRIGUEZ:  I know what we sent him.

2    We sent him the entire affidavit.

3        THE WITNESS:  It is probably somewhere

4    in there.

5        MR. FRIEDLAND:  Why don't I do this.

6    I'll add these pages and make it an 11 page

7    document so it is complete.  It was not

8    together in your pile.

9        THE WITNESS:  I apologize.

10   BY MR. FRIEDLAND:

11   Q.    There is no reason to.

12        Turning to page 5 of Mr. Kail's

13   affidavit, Exhibit 7 to your deposition, paragraph

14   number 8, do you recall reading that particular

15   paragraph and the table underneath it?

16   A.    Baby girls 25 to 45, young and pre-teen

17   girls 7 to 14, junior and women's fashions 15 to 25,

18   baby boys 25 to 45, young and pre-teen boys 7 to 14,

19   men's fashions 15 to 25.

20   Q.    Do you recall reading that when you read

21   Mr. Kail's affidavit?

22   A.    Sure.

23   Q.    Do you have any reason to believe that

24   Mr. Kail is incorrect in describing his company's

25   target markets?

54

```
 1        A.    I --   When I look at --
 2              No.   The answer is no, no reason.
 3        Q.    But you disagree with him?
 4              MR. RODRIGUEZ:  Objection to the form.
 5              THE WITNESS:  I don't think there is a
 6        real disagreement here because, again, I
 7        mentioned before that we're dealing with young
 8        consumers, and most of this is young and
 9        pre-teens, juniors and women's.
10              Again, he may refer to different --
11        That's the whole distribution for 15 to 25.
12        You may have 22 juniors and 3 women and it is
13        included in this category.
14              You have babies, which are young, young
15        and pre-teens are young.  Men's fashion,
16        again, I don't know if he excluded young men
17        as part of it.
18   BY MR. FRIEDLAND:
19        Q.    How with women 25 to 45?  I'm sure most
20   women would consider you flattering calling that
21   young, but is that what you considered young also?
22              MR. RODRIGUEZ:  Excuse me?  What are you
23        referring to?
24              THE WITNESS:  I'm not so sure I
25        understand what you are talking about.
```

55

BY MR. FRIEDLAND:

    Q.   Junior and women's fashions --

        MR. RODRIGUEZ:  That is 15 to 25.

BY MR. FRIEDLAND:

    Q.   Baby boys, 25 to 45.

    A.   Well, babies don't buy it, but the target consumer is a product that is aimed at baby boys.

        MR. RODRIGUEZ:  I think that refers --

        THE WITNESS:  A baby.

        MR. RODRIGUEZ:  I think that refers to months, not years.

        MR. FRIEDLAND:  No, that refers to years.

        MR. RODRIGUEZ:  It is 45 years for a baby boy?

        MR. FRIEDLAND:  Target market for the products.

        THE WITNESS:  The buyer may be the mother, but it's the product that it is referring to.

        And, again, what this doesn't indicate is these are all groups.  It's irrelevant to the relative weight of each of these groups.  My understanding -- and, again, it is just an understanding based on the information that I

1       have, and there may be other information.  My

2       understanding is the majority of the

3       positioning and the activities are aimed at

4       the younger consumer, and this doesn't change

5       it at all.

6               MR. RODRIGUEZ:  May I please see that?

7               MR. FRIEDLAND:  I'm still questioning on

8       it, if that is okay.

9               MR. RODRIGUEZ:  Let me borrow it for a

10      second.

11              (Discussion off the record.)

12              MR. RODRIGUEZ:  Okay.

13  BY MR. FRIEDLAND:

14      Q.    You testified previously that in

15  discussing the issue of the likelihood of confusion

16  with Mr. Rodriguez that the advertising practices of

17  the two parties are different?

18      A.    Correct.

19      Q.    Could you give me a little bit more

20  detail and the basis for that conclusion?

21      A.    Sure.  In terms of the media selected,

22  your client is advertising primarily in teens' and

23  young women's magazines, like *Seventeen*, *Teen*,

24  *Mademoiselle*, and from time to time even in *Vanity*

25  *Fair* or things of that nature, and the theme of the

1    advertising is mainly youth oriented.  It is

2    emphasizing primarily jeans, it is emphasizing

3    all-American authentic jeans.  So that's primarily

4    about your client.

5            In terms of the BONGOS CUBAN CAFE, the

6    advertising has been primarily in newspapers, some

7    travel publications.  It emphasizes the Cuban theme,

8    it emphasizes the restaurant.  It does not emphasize

9    the gift shop.  And, to date, I have to assume that

10   the budget has been much smaller, although I don't

11   know the exact budget.  And the target, the targets

12   are quite different.

13           As I said earlier, your client's main

14   target are young consumers, whether it is the actual

15   user or the buyer, and the BONGO CUBAN CAFE's --

16   sorry -- BONGOS CUBAN CAFE's clients are much

17   broader and aimed at families and other adults that

18   are likely to visit Disney.

19   Q.     What is your impression of who would be

20   the target audience of my client's advertising for

21   baby clothing, the babies or the persons purchasing

22   the clothing for babies?

23   A.     The person purchasing.

24   Q.     Do you have any impression of the target

25   market of that advertising?

58

1     A.     Impression in what sense?

2     Q.     To whom is the advertising for my

3   client's baby clothing directed?

4     A.     When you advertise baby clothing, you

5   advertise it to its parents.

6     Q.     Are you aware of any sort of crossover

7   between the distribution of the publications in

8   which my client advertises and the publications in

9   which Mr. Rodriguez' clients advertise?

10    A.     When you say crossover, define what you

11  mean by crossover.

12    Q.     Do the targets of the ads read both sets

13  of publications?

14    A.     The majority does not.  Obviously, some

15  people will.  It is possible that some will.

16    Q.     Readers of *Seventeen Magazine* don't read

17  the newspaper?

18    A.     No, they definitely do, some.  Most of

19  them don't.

20    Q.     Do you know that for a fact?

21    A.     There is information that teenagers don't

22  read a lot of newspapers.

23    Q.     Are you aware or were you provided

24  information as to my client's advertising in

25  broadcast media?

59

1      A.    I don't believe so.  Maybe it was there

2  and I didn't see it.

3      Q.    Were you provided any videotapes of my

4  client's advertisements?

5      A.    No.

6      Q.    Again, on Mr. Kail's affidavit, Exhibit 7

7  to your deposition, paragraph number 11 towards the

8  bottom, it has a reference to advertisements

9  broadcast on MTV.  Do you see that?

10      A.    Yes, I recall seeing that.  Yes.

11      Q.    But you never saw the ads?

12      A.    No, I didn't see the ads, but I recall

13  reading it, yes.  I just forgot.

14      Q.    Do you have an impression as to whether

15  viewers of MTV read the newspaper?

16      A.    Some do and some don't.

17      Q.    Have you ever seen any Burdines

18  television ads?

19      A.    Yeah, sure.

20      Q.    Did you review any Burdines television

21  ads depicting my client's products?

22      A.    Did I view?  No.

23            MR. FRIEDLAND:  Mark that.  Mark them as

24        four separate exhibits.

25            (Thereupon, the said documents were

60

1    marked for identification as Sarel Deposition

2    Exhibit Numbers 8, 9, 10 and 11.)

3              MR. FRIEDLAND:  I'm just going to go and

4         make a quick copy of these.

5              MR. RODRIGUEZ:  Oh, we'll take a break

6         then.

7              (Thereupon, a brief recess was taken,

8    after which the following proceedings were had:)

9    BY MR. FRIEDLAND:

10        Q.   Dr. Sarel, before we went on break I

11   marked Exhibits 8, 9, 10 and 11, four separate one

12   page documents.

13             Starting with Exhibit Number 8, can you

14   identify the documents for me?

15        A.   Yes, that is interviewer instructions

16   that I created and faxed to Barbara Nolan Market

17   Research on the 24th of December.

18        Q.   Did you prepare that document?

19        A.   Yes, I did.

20        Q.   Is that the only version of the document

21   that was faxed to Ms. Nolan?

22        A.   Correct, but there is no Ms. Nolan.  That

23   is the name of the firm.

24        Q.   The name of the company?

25        A.   Right.

61

1      Q.    Who was your contact at Barbara Nolan?

2      A.    Ruth Kent, K-e-n-t.

3      Q.    Did you prepare the interviewer

4   instructions that are Exhibit 8 from scratch, or did

5   you have an existing set of interviewer instructions

6   from previous experience that you utilized?

7      A.    It is from scratch, but I have used

8   similar things in the past.  So, I created this

9   document from scratch based on similar things I have

10  done in the past.

11     Q.    Were any of those similar things you have

12  done in the past with respect to trademark

13  infringement litigations?

14     A.    No, these are general, not litigations.

15  As I said before, I was not involved in the surveys

16  for litigation, but these are common instructions

17  for market intercept studies.

18     Q.    Could you identify Exhibit 9 for me?

19     A.    Exhibit 9 is identical to Exhibit 8.  It

20  is the same exhibit, but it has the signatures of

21  the interviewers after they have been trained, to

22  make sure that they understood, they read it, and

23  they were going to abide by these instructions.

24     Q.    I believe you previously testified there

25  were six interviews and a supervisor, correct?

62

1          A.     Right.

2          Q.     Was Ms. Kent the supervisor?

3          A.     Correct.

4          Q.     And the six names which appear below hers

5     on Exhibit 9, is it your understanding these are the

6     six interviewers?

7          A.     Correct.

8          Q.     Did you ever meet any of those six

9     interviewers?

10         A.     No.

11         Q.     Have you ever spoken with any of them?

12         A.     No.

13                MR. FRIEDLAND:   Off the record a second.

14                (Discussion off the record.)

15    BY MR. FRIEDLAND:

16         Q.     Could you identify for me, Dr. Sarel,

17    Exhibit Number 10?

18         A.     Exhibit 10 is the fax memorandum I faxed

19    Ruth Kent on the 24th, providing her with the survey

20    and telling her for the first time the location, the

21    person to contact and so on.

22                It was part of the material I sent.   I

23    sent Exhibit 10 with Exhibit 8, and the survey.

24         Q.     Did you send Exhibit 10 from your

25    computer or you printed it out?

LASER BOND FORM B   ●   PENGAD · 1-800-631-6989

63

1         A.    No, from the computer.  Everything was

2    from the computer.

3         Q.    But you made a copy of this?

4         A.    Right.

5         Q.    But you didn't make a copy of any of the

6    faxes you sent to Mr. Rodriguez?

7              MR. RODRIGUEZ:  Objection to the form.

8              THE WITNESS:  No, I did not make any

9         copies.

10   BY MR. FRIEDLAND:

11        Q.    The survey that you sent to Ms. Kent, is

12   that this same survey that Mr. Rodriguez approved

13   for you to use?

14        A.    Correct.

15        Q.    Is it the same survey that is attached to

16   your report which we have marked as Exhibit 4, which

17   we'll get to in a minute?

18        A.    Yes, it is.

19              Mine was on two sides, and they copied it

20   on one side, I mean, on one piece of paper.  I'll

21   repeat it.  Mine was a two page document and they

22   copied it onto one page.

23        Q.    They made it a front and back copy?

24        A.    Yes.

25        Q.    Okay.  Numbered item 2 of your fax to

1    Ruth Kent asks her to make 500 copies for the

2    weekend.  Do you see that?

3        A.    Correct.

4        Q.    Why did you select that number?

5        A.    Just to make sure that they had enough.

6        Q.    Did you provide Ms. Kent any instructions

7    as to a minimum number of interviews to conduct?

8        A.    No.

9        Q.    A maximum number?

10       A.    No.

11       Q.    What instructions at all did you provide

12   Ms. Kent?

13       A.    The instructions were to interview based

14   on the criteria that I outlined here, between 12

15   o'clock and 8:30, and to get as many as you could.

16       Q.    Where is it noted that she was instructed

17   to have the interviews conducted between 12 and

18   8:30?

19       A.    It is possible we talked about it over

20   the phone.

21             No, we probably discussed it over the

22   phone.

23       Q.    Item number 3 on your fax to Ms. Kent,

24   Exhibit Number 10 to your deposition, mentions in

25   the second sentence that you will discuss details

65

1    over the phone?

2         A.    Mm-hmm.

3         Q.    What specific details did you discuss

4    with her over the telephone?

5         A.    I guess the 12 to 8:30 that we just

6    discussed, and the details, if she had any

7    questions, I will answer anything she needed to make

8    sure that she and I were in complete agreement.

9         Q.    Who trained the interviewers?

10        A.    Ruth Kent.

11        Q.    Have you had any discussions with

12   Jack Hylen?

13        A.    Yes, I had a discussion with him on the

14   24th.  I believe on the 24th.  Let me see.  Yeah.

15        Q.    What did you talk about with him?

16        A.    I wanted to make sure that he was aware

17   that a survey was going to be conducted.

18        Q.    Was he?

19        A.    Yes, he was.

20        Q.    Okay.

21        A.    And I wanted to make sure that he is

22   going to be there, that there is going to be a

23   contact person if the interviewers face any problems

24   from someone, that he should be aware of that.

25             Basically just a question of letting him

66

1    know that it is happening, making sure there is a

2    contact person, making sure that there won't be any

3    difficulties or problems, and telling him that

4    Disney approved it.

5        Q.    Did you have any other discussions with

6    him?

7        A.    No.

8        Q.    Okay.  The sixth numbered item --

9        A.    Which item?

10       Q.    Sixth.

11       A.    Oh, this one?

12       Q.    Sixth.

13       A.    Okay.

14       Q.    The sixth item on your fax to Ms. Kent

15   requests that each of the interviewers signs the

16   interviewer instruction sheet after the Saturday

17   training session.

18             Do you see that?

19       A.    Correct.

20       Q.    Would that have been Saturday the 27th of

21   December?

22       A.    Correct.

23       Q.    Looking back at Exhibit 9, were your

24   instructions followed?

25       A.    Yeah, they signed it.

1    Q.    On the 27th?

2    A.    Yeah.    That's what I --    The 27th.

3    Q.    Do you have any understanding as to why

4    the 29th is also listed as a date?

5    A.    I think what happened, they started with

6    four interviewers, and they added two more on the

7    29th.  So she trained them and they signed it on the

8    29th.

9    Q.    Okay.  The seventh numbered item on your

10   fax to Ms. Kent, Exhibit 10, is a statement that it

11   is important to keep an accurate log of the

12   nonresponse rate, open paren, refusal data, close

13   paren.

14         Do you see that?

15   A.    Correct.

16   Q.    Do you have such a log?

17   A.    Yeah, it is here (indicating).

18   Q.    Is that Exhibit 11?

19   A.    Yes.

20   Q.    Is this document a log of the entire

21   survey or just of refusals?

22   A.    It is the entire survey and refusals.

23   Q.    Which portion of the log is refusals?

24   A.    It says "Ref" here (indicating).

25   Q.    The second to last line?

1      A.    Yeah.

2      Q.    What is the line under that?   "L/B" it

3   looks like.

4      A.    The language barrier.   These are the

5   Spanish only speaking people that did not want to

6   participate in English.

7      Q.    Did the survey form used by your

8   interviewers provide an area for the interviewer to

9   indicate if the survey interview had been refused or

10  the interview request had been refused?

11     A.    They recorded it.   Whether they recorded

12  it on the survey or a separate form, I don't know.

13     Q.    How about the language barrier, the same

14  thing?

15     A.    Yeah.

16     Q.    Did you receive 121 interview forms that

17  simply stated "refused"?

18     A.    No.

19     Q.    Did you receive 42 forms indicating a

20  language barrier?

21     A.    No.

22     Q.    Did you receive anything other than 384

23  completed survey forms?

24     A.    No.

25     Q.    When did you receive the forms?

```
 1        A.    I received them in two batches.  The
 2   first one was on --  Let's see.  It was --  Is
 3   this my date?
 4              It was sent to me on Tuesday.  Tuesday
 5   was the 30th, I believe.  Right?  Yeah.  Tuesday the
 6   30th is the first group, and on the 31st the second
 7   group.
 8        Q.    The log marked as Exhibit 11, the final
 9   written line of the log is the word "corrected".
10              Do you see that?
11        A.    Mm-hmm.  Yes.
12        Q.    Did you receive an earlier version of
13   this log?
14        A.    No, not an earlier version.  On the 30th,
15   after the first two days, I got basically column one
16   and column two, the 27th and the 28th.
17        Q.    And then you got an updated version --
18        A.    Right.
19        Q.    -- adding the third day of the survey?
20        A.    Right.
21        Q.    Where is the first version you received?
22        A.    I don't know if I have it.  I don't
23   remember.  But they were identical.
24        Q.    Other than the addition of the third day
25   data?
```

70

1      A.      Right.

2      Q.      Looking at Exhibit 5 --

3      A.      What is Exhibit 5?

4      Q.      Your activities log.

5      A.      Yes.

6      Q.      When did you prepare that?

7      A.      Yesterday.

8      Q.      What was your source of information for

9  preparing it?

10     A.      I kept notes of some of these things, and

11  I put it on my calendar.

12     Q.      Where are your notes?

13     A.      Notes in the calendar, that's what I

14  mean.

15     Q.      Do you have your calendar with you?

16     A.      No.

17     Q.      Was there anything other than your

18  calendar that you used to create this activities

19  log, Exhibit 5?

20     A.      No.

21     Q.      Do you have any detailed time records on

22  this matter?

23     A.      I have detailed time records in my

24  calendar on the time on the hourly work.  I don't

25  have detailed hourly information on the survey

1   because I wasn't keeping it because I'm not paid by

2   the hour.

3        Q.    At what point on this activities list did

4   your hourly work stop and your survey --

5        A.    When the survey was approved, it stopped,

6   and it started again on Monday when I met with

7   Mr. Rodriguez, and yesterday when I prepared for

8   this deposition.

9        Q.    Since there is more than one entry for

10  the survey approval, is it when Mr. Rodriguez

11  approved the concept of taking the survey, or the

12  form of the survey?  One is on the 22nd and one is

13  on the 24th.

14            MR. RODRIGUEZ:  Objection to the form.

15  BY MR. FRIEDLAND:

16       Q.    I believe you previously testified --

17       A.    No, I think it's on the 24th because,

18  again, on the 26th --  Just a second.  Let's look

19  at the dates.

20            Let's see.  The survey was approved on

21  the 22nd.  No, it's the 22nd.  That's it, yes.

22            MR. FRIEDLAND:  Mark this as a

23       cumulative exhibit.

24            (Thereupon, the said documents were

25  marked for identification as Sarel Deposition

72

1     Exhibit Number 12, a composite exhibit.)

2     BY MR. FRIEDLAND:

3          Q.    Dr. Sarel, I'm going to hand you what has

4     been marked as Exhibit 12, just for the purpose of

5     identifying it.

6               Could you tell me what these papers are

7     which were provided to me today?

8          A.    These are the survey forms, the

9     questionnaires we have used to interview the people

10    at BONGOS CUBAN CAFE.  These are the 384 completed

11    questionnaires.

12         Q.    Okay.  Have you marked upon these papers

13    at all?

14         A.    Have I marked upon these?  I verified the

15    codes on the side here (indicating).  These the only

16    thing.

17         Q.    On the left side?

18         A.    On the left side, right.

19              MR. FRIEDLAND:  Let's mark this as

20         Exhibit Number 13.

21              (Thereupon, the said document was marked

22    for identification as Sarel Deposition Exhibit

23    Number 13.)

24    BY MR. FRIEDLAND:

25         Q.    Can you identify Exhibit 13 for me?

73

1      A.     Yeah, Exhibit 13 is the codes used to

2  code the open-ended questions in the questionnaire.

3      Q.     Those are the codes appearing on the left

4  side of the --

5      A.     Correct.  Some of them are not

6  open-ended.  So these are just the open-ended

7  questions.

8      Q.     The numbers appearing on the left column

9  of Exhibit 13 correspond with question numbers on

10  your survey?

11      A.     Correct.

12      Q.     You created the codes based upon the

13  respondents' answers?

14      A.     Yes.

15      Q.     Turning next to your survey report,

16  Exhibit 4, numbered page 2, the Executive Summary.

17            Before I ask you specific questions, did

18  the woman you referred to as Becky assist in the

19  preparation of this report?

20      A.     No.

21      Q.     Did anyone assist in the preparation of

22  this report?

23      A.     No.

24      Q.     The second sentence in the first

25  paragraph of the Executive Summary reads:

1                "Dr. Sarel was" --

2        A.     Sarel.

3        Q.     Sarel.  Sorry.

4                "Dr. Sarel was commissioned to conduct a

5        marketing survey of BONGOS CUBAN CAFE

6        customers."

7                Do you see that?

8        A.     Yes.

9        Q.     On December 11th, when Mr. Rodriguez

10   retained your services, were you commissioned to

11   conduct the survey?

12       A.     No.

13               MR. RODRIGUEZ:  Objection, asked and

14       answered.

15               THE WITNESS:  The answer is no.

16   BY MR. FRIEDLAND:

17       Q.     What do you mean by a marketing survey?

18       A.     A consumer survey, it's called a

19   marketing survey.

20       Q.     What do you mean by a consumer survey?

21       A.     Interviewing consumers.

22       Q.     Who determined the objective of the

23   marketing survey?

24       A.     I did.

25       Q.     Why did you determine the particular

LASER BOND FORM B   PENGAD · 1-800-631-6989

1    objective set forth in the third sentence of the

2    Executive Summary, first paragraph?

3        A.    I thought it was relevant to this case

4    and the issue here is whether there is confusion or

5    not, and that's why I felt this would be a relevant

6    objective.

7        Q.    Why did you elect to conduct a marketing

8    survey of only customers of BONGOS CUBAN CAFE?

9            MR. RODRIGUEZ:  Objection to the form of

10           the question.

11           THE WITNESS:  Could you repeat the

12           question, please?

13   BY MR. FRIEDLAND:

14       Q.    Why did you elect to conduct a marketing

15   survey of customers of BONGOS CUBAN CAFE?

16       A.    I thought the main issue here was whether

17   customers, consumers of BONGOS CUBAN CAFE are

18   confused with your client's brand, and this was a

19   very important part of the analysis and that is why

20   we conducted it.

21       Q.    But you have previously testified this

22   morning that customers of other than BONGOS CUBAN

23   CAFE are relevant in determining likelihood of

24   confusion, correct?

25       A.    Yeah, that is correct.

76

1      Q.     You refer to "plaintiff's brand" in the
2   third sentence of the first paragraph of the
3   Executive Summary?
4      A.     Yes.
5      Q.     What do you mean by that?
6      A.     BONGO.
7      Q.     The trademark?
8      A.     Mm-hmm.
9             MR. PHILLIPS:  Yes?
10            THE WITNESS:  Yes.
11            MR. PHILLIPS:  She can't take down
12        mm-hmm.
13            THE WITNESS:  I see.
14            MR. PHILLIPS:  Okay.
15  BY MR. FRIEDLAND:
16     Q.     The last sentence of that first paragraph
17  refers to the design and implementation of a market
18  study to meet the stated objectives.
19            Do you see that?
20     A.     Mm-hmm.
21     Q.     Other than a possible typo, is the use of
22  the word "objectives" in the plural as opposed to
23  the use of the word "objective" in the prior
24  sentence of any significance?
25     A.     Correct, I was talking about the

77

1    "associating or seeing a connection".  I'm referring

2    to the previous sentence, the objective stated in

3    the previous sentence.

4        Q.    Okay.  In analyzing my client's brand,

5    were you provided any information separate and apart

6    from what Mr. Rodriguez gave you and your visit to

7    Burdines, and perhaps a telephone call to your

8    sister?

9            MR. RODRIGUEZ:  Objection, asked and

10        answered.

11           THE WITNESS:  Was I provided with any

12       additional information?

13   BY MR. FRIEDLAND:

14       Q.    Yes.

15       A.    I saw the merchandise that Mr. Rodriguez

16   brought to my office.

17       Q.    But that was subsequent to writing this

18   report, correct?

19       A.    Right.

20           What was the question?

21       Q.    You have used the term "plaintiff's

22   brand" in your report.

23       A.    Yes.

24       Q.    In determining what the plaintiff's brand

25   is --

1      A.    Mm-hmm.   It's based on this information

2    (indicating).

3      Q.    Okay.   Also based on your visit to

4    Burdines?

5      A.    Yes, based on all of those things that I

6    mentioned before.

7      Q.    And the telephone call with your sister?

8      A.    Correct.

9      Q.    In the second paragraph of the Executive

10   Summary you present a definition of customers.   Do

11   you see that?

12     A.    Yes.

13     Q.    How do you know from the documents that

14   have been marked as Exhibit 12 to this deposition

15   that none of the respondents were associated with

16   either party to this lawsuit?

17     A.    We had a screening question, and we

18   didn't ask specifically about these two firms, but

19   if you will look at question 10, it asks what

20   business or industry are you in.

21           We were mainly interested in people

22   saying we are in the fashion industry or in the

23   restaurant industry.   And we didn't have --   We had

24   one that said fashion design, but --

25     Q.    Did you eliminate that response?

1          A.      No, we did not eliminate the response.

2          Q.      Do you know whether that person is

3   associated with either party to this lawsuit?

4          A.      No, I don't.

5          Q.      Do you know whether any of the attorneys

6   in this lawsuit participated in your survey?

7          A.      The ones sitting in the room?

8               MR. RODRIGUEZ:  Objection to the form of

9          the question.

10               THE WITNESS:  Any attorneys

11          participating --

12               MR. RODRIGUEZ:  What do you mean,

13          participating in what sense?

14   BY MR. FRIEDLAND:

15          Q.      Do you know if any attorney representing

16   any of the parties in this lawsuit participated in

17   your survey?

18               MR. RODRIGUEZ:  Objection to form, asked

19          and answered as to the degree of participation

20          of the attorneys in this case.

21               THE WITNESS:  In looking at the answers

22          to question 10, if I recall correctly, there

23          is no one indicating that they were an

24          attorney.

25   BY MR. FRIEDLAND:

1      Q.    So question 10 was the only way you could

2  determine whether or not a respondent was associated

3  with the plaintiff or the defendant?

4      A.    Correct.   That is correct.

5            And the idea here was to eliminate, yeah,

6  people that are extremely familiar with the

7  situation, and the end result was we did not

8  eliminate any person.

9      Q.    Do you know if Gloria Estefan was

10 interviewed for this survey?

11     A.    Yes, I know she was not.

12     Q.    How do you know?

13     A.    Because we have the names of the

14 individuals that participated in the survey.

15     Q.    You have the names?

16     A.    Yes.   And I also know that they were not

17 there at the time.

18     Q.    How do you know that?

19     A.    Because we were discussing it to make

20 sure that they won't be there so there won't be any

21 bias.

22     Q.    With whom did you discuss that?

23     A.    I discussed it with Mr. Rodriguez and

24 Mr. Rodriguez' secretary.

25            There was a chance on the 31st

1      Mr. Estefan was going to be there, and that's why we

2      terminated the questionnaire on the 29th.

3          Q.    The next sentence of the second paragraph

4      of the Executive Summary states:

5              "A 384 respondent sample was recruited

6          and interviewed...following established market

7          research procedures."

8              Do you see that?

9          A.    Mm-hmm.  Correct.

10         Q.    What were those procedures?

11         A.    The ones you have seen before on Exhibit

12     10 and Exhibit 8.

13         Q.    Who established those procedures?

14             MR. RODRIGUEZ:  Objection, asked and

15         answered.

16             THE WITNESS:  I wrote these specific

17         guidelines based on 20 years of market

18         research.

19     BY MR. FRIEDLAND:

20         Q.    Are these guidelines approved by any

21     particular marketing organization?

22             MR. RODRIGUEZ:  Objection to the form.

23             THE WITNESS:  Are these guidelines the

24         guidelines that are approved?  Is it verbatim

25         word by word?  I can't answer that, but these

82

1          are clearly approved guidelines.

2                  The approach is definitely the one that

3          is recommended, yeah.

4      BY MR. FRIEDLAND:

5          Q.    Recommended by whom?

6          A.    By the American Marketing Association.

7          Q.    Recommended for what purpose?

8          A.    Market research.

9          Q.    What sort of market research were you

10     conducting in this survey?

11         A.    This is a consumer intercept study.

12         Q.    What sort of market research are you

13     performing in this consumer intercept study?

14                 MR. RODRIGUEZ:  Objection to form.

15                 THE WITNESS:  We are intercepting

16          consumers and asking them questions about

17          perceptions and associations relative to the

18          BONGOS CUBAN CAFE.

19     BY MR. FRIEDLAND:

20         Q.    The second to last sentence of this

21     paragraph states:

22                 "It is based on a now-standard survey

23          format recommended by McCarthy."

24                 Do you see that?

25         A.    Yes, I do.

1    Q.    Where in Professor McCarthy's book does

2  he recommend the survey format you utilized?

3    A.    I don't remember the page, but he has a

4  section on survey research and he discusses various

5  approaches.  That's one of them that is very

6  commonly used.

7    Q.    I have Professor McCarthy's book with me.

8    A.    Sure.

9    Q.    Could you show me that section, please?

10    A.    Sure.

11         MR. RODRIGUEZ:  Objection to the form of

12         that question.

13  BY MR. FRIEDLAND:

14    Q.    Do you know which volume?

15    A.    I think it's three or four.

16         One of them has an index and --

17         It is Section 32.  I was right.

18         This has never been used.

19    Q.    Hot off the presses.

20    A.    I read the whole section, basically,

21  Section 32 or Chapter 32.  I don't know if it is

22  this version or not.

23         This is '96 or --  I read the '96.  Yeah,

24  there are many issues that are based on that, so it

25  is not a specific page.

84

1          Q.    Does Professor McCarthy's book provide a

2    form survey?

3          A.    I'll show you in a second if you would

4    like.

5                This is more detailed than the one that I

6    used.

7                Let me go back to the index and see if it

8    says it or provides more information.

9          Q.    Okay.

10         A.    Does that reference every case or not?

11         Q.    You mean actual cases?

12         A.    Yes.

13         Q.    Yes.  Here.

14         A.    Do you have the '96 edition?

15         Q.    They are supplemented every year.  That

16   is updated to incorporate the '96 edition.

17              MR. RODRIGUEZ:  Professor, if you don't

18         recall specifically, that is fine.

19              I think you referred him to the chapter.

20              THE WITNESS:  One of the cases I

21         referred to was the Eveready Battery case, but

22         I saw it here in a different place.  So I

23         don't see it in this chapter, and this chapter

24         is quite long.

25              I mean, there is a reference here in

1        32-144, but it does not have the specific

2        format.

3            The '96 edition had the specific format.

4        This is 32 here.  I can get it from the '96

5        edition.

6    BY MR. FRIEDLAND:

7        Q.    In reviewing Professor McCarthy's books,

8    did you come across other types of surveys that

9    could be utilized?

10        A.    I read the whole chapter.

11        Q.    Okay.  Were there other types of surveys

12    discussed in the chapter?

13        A.    There were different approaches too.

14        Q.    Why did you select this particular

15    approach?

16        A.    Because I felt it was most appropriate.

17    They gave people the most opportunity to verbalize

18    their perception associations and thoughts about

19    this brand.

20            That is a similar approach we have used

21    in many studies.  Just the fact that I found it in

22    Professor McCarthy's book reaffirmed my convictions

23    that it is a good approach.

24        Q.    What is the universe of a survey?

25        A.    It is the total population that you want

1    to draw from.

2         Q.    And what universe did you select in this

3    particular survey?

4         A.    The BONGOS CUBAN CAFE customers.

5         Q.    In formulating your survey, did you look

6    into the issue of measuring a possible likelihood of

7    confusion with respect specifically to the parties'

8    clothing products?

9         A.    Repeat the question, please.

10        Q.    In putting together your survey, did you

11   consider the issue of having respondents compare the

12   parties' respective clothing products?

13             MR. RODRIGUEZ:  Objection to the form.

14             THE WITNESS:  I believe you asked a

15        different question before, and so I wasn't

16        sure about it.

17             I thought about all of the potential

18        confusion issues, and so in that sense I

19        considered those issues.

20   BY MR. FRIEDLAND:

21        Q.    Did you consider presenting respondents

22   samples of the parties' clothing products in

23   connection with the survey?

24        A.    I considered it and I thought it was not

25   a good idea.

1      Q.    Why not?

2      A.    Because you are creating bias, and in an

3  intensive association you are trying to create a

4  representation of reality, and a consumer in the

5  BONGOS CUBAN CAFE environment doesn't face any of

6  your client's products, and if you present someone

7  and you force a question, you are introducing an

8  element.  You are introducing a bias in the process.

9          So my objective was to focus on BONGOS

10  CUBAN CAFE customers and try to see if they

11  associate that brand, that environment, that logo

12  with anything else.

13      Q.    Why can't you see my client's products in

14  BONGOS CUBAN CAFE?

15      A.    Why can't I see them?

16      Q.    Yes.

17      A.    Because I don't believe they are sold

18  there.

19      Q.    Can they be worn there?

20      A.    That a possibility.

21      Q.    Are you familiar with a term post-sale

22  confusion?

23      A.    Post-sale confusion, yes.

24      Q.    What does that term mean to you?

25      A.    It means after the sale, after someone

88

1  bought a product, someone else may see that person,

2  in this case wearing the T-shirt, and may get

3  confused.

4      Q.    Did you look at that issue in formulating

5  your survey?

6      A.    In formulating the survey, I did not

7  focus on post-sale confusion.

8      Q.    Why not?

9      A.    Because they had a limited objective and

10 in that environment, that is the only thing that you

11 could do.

12     Q.    Did you consider conducting a survey at

13 locations where my client's products are sold?

14     A.    As I mentioned earlier, I considered many

15 different options, but since the objective of the

16 study was to measure the BONGOS CUBAN CAFE

17 customers' perceptions and potential for confusion,

18 we interviewed where we did.

19     Q.    But I asked you a specific question.

20        Did you consider specifically conducting

21 a survey at locations where my client's products are

22 sold?

23        MR. FRIEDLAND:  I believe he answered.

24     Objection, asked and answered.

25        THE WITNESS:  I thought about conducting

1          a survey in a mall, for example, but I didn't

2          think -- feel it would be appropriate,

3          .feasible or efficient in any way.

4     BY MR. FRIEDLAND:

5          Q.    Did you take any steps to determine the

6     respondents' purchasing habits with respect to

7     clothing products?

8          A.    No, I did not.

9          Q.    Why not?

10         A.    I did not think it was extremely

11    relevant.

12         Q.    Why not?

13         A.    Because the issue was whether when they

14    are exposed to the BONGOS CUBAN CAFE logo brand

15    environment merchandise, are there any associations

16    created by that exposure and experience, and I felt

17    that this was the most appropriate element.

18              The other issue is, I wanted to make sure

19    that none of the interviewers had any bias, any idea

20    of the purpose of the survey of what we were looking

21    for.

22         Q.    On the fourth page of your report, the

23    top paragraph, you state that the two criteria under

24    which customers were to be --

25         A.    Just a second.  On the top?  Page 4?

90

1      Q.    Top of page 4.

2      A.    Yes.

3      Q.    It states:

4            "Interviewers were instructed to

5      interview customers in the following order".

6      A.    Right.

7      Q.    Do you see that?

8      A.    Yes.

9      Q.    There is and an (a) and a (b)?

10     A.    Yes.

11     Q.    The (a) reads:

12           "Immediately after finishing eating or

13     shopping in the gift shop."

14     A.    Right.

15     Q.    Was a purchase required by someone in the

16     gift shop?

17     A.    No.

18     Q.    Item (b) reads:

19           "While waiting inside restaurant before

20     they are seated."

21           Do you see that?

22     A.    Yes.

23     Q.    Was the person waiting inside the

24     restaurant required to subsequently sit and eat at

25     the restaurant?

1      A.    No.

2      Q.    Page 5 under the heading "Sample

3  Composition," you have a statement:

4            "Approximately three-quarters of the

5            respondents were visitors to the Orlando area."

6      A.    Yes.

7      Q.    Did you make any effort to determine from

8  where the visitors were visiting?

9      A.    No.

10     Q.    Why not?

11     A.    I didn't feel it was relevant.

12           Again, there is another issue in surveys

13  like this, in terms of focusing on the most relevant

14  issue, because you can't keep them too long and if

15  you want to make sure you get correct answers to the

16  important issue, you can't spend an hour

17  interviewing them.

18     Q.    Did you make any effort to determine

19  whether the visitors were visiting from within the

20  United States or outside of the country?

21     A.    No.

22     Q.    So, conceivably three-quarters of your

23  respondents could have been from Europe?

24     A.    No.

25           MR RODRIGUEZ:  Objection to form.

92

1    BY MR. FRIEDLAND:

2         Q.    Why not?

3               MR. RODRIGUEZ:  First of all, objection,

4         asked and answered previously as to the

5         expected market.

6               THE WITNESS:  It is extremely unlikely.

7    BY MR. FRIEDLAND:

8         Q.    But not impossible?

9               MR. RODRIGUEZ:  Objection to form.

10              THE WITNESS:  From a statistical

11        perspective, the chance of this is smaller

12        than winning the lottery.

13   BY MR. FRIEDLAND:

14        Q.    From the statistical perspective, is

15   there any chance that part of the three-quarters of

16   the visitors were from outside the country?

17        A.    Yes.

18        Q.    What percentage?

19        A.    We don't know.

20        Q.    Did you get any sort of information from

21   Disney as to what percentage of their visitors at

22   this time of the year are from outside the United

23   States?

24        A.    No, but what I did get from Disney is

25   that they felt this time presented an excellent time

93

1    to get a cross section of the U.S. population.  We

2    did not discuss international visitors.

3        Q.    Do you know what percentage of visitors

4    to Disney are international?

5        A.    No.

6        Q.    Are you familiar with the term "reverse

7    confusion" in a trademark infringement setting?

8        A.    I read about it.

9        Q.    In the papers?

10       A.    No, in the --  When I read the chapter

11   of McCarthy I read it.

12       Q.    What is your understanding of this term?

13       A.    That, if I'm correct, that the customers

14   of this case, your client's customers will be

15   confused by BONGOS CUBAN CAFE.  They will --  The

16   brand will overwhelm them and they will think that

17   it was taken over by the other brand.  It dilutes

18   your client's brand.

19       Q.    Were you surprised that nearly 80 percent

20   of the respondents associated the restaurant with

21   the Estefans?

22       A.    Was I surprised?  It was higher than I

23   expected.

24       Q.    What did you expect?

25       A.    I didn't form a specific percentage, but

94

1    I felt that many would know, but I didn't know that

2    it was so strong.  So I didn't have a specific

3    figure in mind.  I knew many would know, but I

4    didn't expect it to be so high.

5        Q.    Can you reach any conclusions based on

6    the fact that 80 percent of the respondents

7    identified Gloria and Gloria and/or Emilio Estefan

8    as owning the restaurant?

9            MR. RODRIGUEZ:  Objection to form.

10           THE WITNESS:  Can I reach any

11       conclusions?

12   BY MR. FRIEDLAND:

13       Q.    Yes.

14       A.    The conclusions, the conclusion --

15           The answer is yes.

16       Q.    What conclusions can be reached?

17       A.    The conclusion is that there is a strong

18   knowledge and association between the Estefans and

19   the restaurant.

20       Q.    Going to page 7 of your report, under the

21   "Conclusions" section, the last sentence reads:

22           "For all practical purposes we can state

23       that customers of BONGOS CUBAN CAFE, as

24       represented in this study, are not thinking

25       about a relationship, an association,

95

```
 1        sponsorship or similarity between plaintiff's
 2        brand and BONGOS CUBAN CAFE."
 3             Do you see that?
 4        A.   Yes, I do.
 5        Q.   Who are you referring to when you say
 6   "we," just yourself?
 7        A.   Yes.
 8        Q.   To reiterate an earlier point, customers
 9   of BONGOS CUBAN CAFE are not the only customers who
10   are relevant in a likelihood-of-confusion analysis;
11   is that correct?
12             MR. RODRIGUEZ:  Objection, misstates a
13        prior point.
14   BY MR. FRIEDLAND:
15        Q.   Correct?
16             MR. RODRIGUEZ:  Objection to form.
17             THE WITNESS:  Could you repeat the
18        question?
19             MR. FRIEDLAND:  Read it back, please.
20             (Thereupon, the portion referred to was
21   read by the reporter as above recorded.)
22             THE WITNESS:  That is right.
23   BY MR. FRIEDLAND:
24        Q.   Did your survey test for reverse
25   confusion?
```

96

1          A.     Not directly.

2          Q.     If not directly, how?

3          A.     Since the survey represents, in my

4     opinion, a cross section of the U.S. population,

5     including customers of your client's brand, there

6     was no evidence that indicated any confusion.  If

7     there was a slight chance, it would have been

8     presented in the results.

9               So indirectly those customers obviously

10    are not confused.

11         Q.     Don't you mean that those customers now

12    think that the Estefans own the BONGOS name?

13              MR. RODRIGUEZ:  Objection to form.

14              THE WITNESS:  No, those customers know

15         that, or some of them do, not all --  As we

16         said, only 80-some percent knew.  There were

17         other questions relating to association,

18         sponsorship, names of other companies, other

19         merchandise, things of that nature, and those

20         customers, if they were to be confused, at

21         least some of them would have mentioned your

22         client's name.

23    BY MR. FRIEDLAND:

24         Q.     Does your survey in any way measure a

25    likelihood of confusion based solely upon the

1   clothing items sold by the respective parties?

2          MR. RODRIGUEZ:  Objection, asked and

3      answered.

4          THE WITNESS:  We had --

5          The answer is partially yes, because we

6      had a small, but we had a percentage of the

7      consumers here that visited only the gift

8      shop.

9          We interviewed approximately 14 or

10     15 percent only in the gift shop.  When we

11     analyzed, we found that slightly -- about

12     5 percent went only to the gift shop and

13     didn't see, did not see the restaurant.

14         So they were exposed to the merchandise.

15     So, their opinion is based only on the

16     merchandise and what they saw.

17  BY MR. FRIEDLAND:

18     Q.   They weren't exposed to the restaurant?

19     A.   We asked specifically did you visit the

20  restaurant, whether they saw the place.  They saw

21  part of it, but they did not visit the restaurant.

22  We specifically asked, did you visit the restaurant?

23  Were they aware that there was a restaurant there?

24  I'm sure they were.

25         MR. FRIEDLAND:  Let me take a couple of

```
 1              minutes with Gary, and I think I can wrap up.
 2                   (Thereupon, a brief recess was taken,
 3      after which the following proceedings were had:)
 4      BY MR. FRIEDLAND:
 5           Q.    Dr. Sarel, let me ask you to take a look
 6      at Exhibit 13, which is your codes, and if I
 7      understand your previous testimony, you prepared
 8      these codes based on actual responses --
 9           A.    Correct.
10           Q.    -- by the interviewees, correct?
11           A.    Correct.
12           Q.    Okay.  I'm going to share that with you,
13      because we only have the one copy.
14                   Looking at --
15           A.    I prepared them based on the responses
16      and potential answers that I thought might be
17      relevant.
18                   I read the questionnaires.  Basically,
19      remember, what I got initially, I got the first
20      group of, like, the first two days.  I got about
21      half of them, something like that.
22                   I read every questionnaire, and based on
23      this I prepared answers that I thought were relevant
24      and answers that I thought could be given the next
25      day, because we wanted to make sure that we have a
```

99

1    consistent scheme.

2         Q.    So, for instance, on the coding next to

3    question 5, where you have seven listed --

4         A.    Correct.

5         Q.    -- and then on your report, on question 5

6    where you don't have all seven listed --

7         A.    Right.

8         Q.    -- those that are not overlapped are

9    those that you thought might be answered?

10        A.    Right.  I knew this was a study about

11   BONGO/BONGOS, and I wanted to make sure that if it's

12   mentioned there, it's marked correctly.

13        Q.    The same would be true, for instance, on

14   7a, where you have nine different items listed, and

15   in your report on page 13 --   I think it's a typo,

16   where it says question 6a.  I believe it should be

17   7a.

18        A.    Correct.

19        Q.    You don't have all nine of those listed.

20   Is it because your list of possible answers --

21        A.    No, what happened is we combined in the

22   analysis there the T-shirt and other clothing.  It

23   includes T-shirts, shirts and hats, shirts and mugs,

24   coats and clothes.

25              So basically this was prepared as we went

100

1    along, and we just edit more.

2        Q.    Looking at page 5 of your report, under

3    "Key Findings And Analysis".

4        A.    Yes.

5        Q.    The second paragraph --

6        A.    Yes.

7        Q.    -- talks about interviewees experiencing

8    possibly both the restaurant and gift shop with

9    regards to where you interviewed them?

10       A.    Yes.

11       Q.    Could you explain to me how you came up

12   with the numbers that are set forth in this

13   paragraph?

14       A.    The 85.9 and the 14.1 is the one that you

15   are referring to?

16       Q.    Well, those I think are self-explanatory

17   from the report, because your report checked off

18   where they were interviewed.

19       A.    So repeat your question.  I missed the

20   question.

21       Q.    You have other numbers in here.

22            MR. RODRIGUEZ:  Which number are you

23        referring to?

24            THE WITNESS:  The 95.8, you mean?

25   BY MR. FRIEDLAND:

101

1       Q.    The Table 1 numbers.

2       A.    Yes, it's a combination of multiple

3    tables.  I believe if you want to go back to the

4    original --

5           It's a computer analysis, but if you look

6    at the data, there is a question, I think 8a and 8b,

7    where we asked people --   Say you were interviewed

8    only in the restaurant.  We asked you, did you also

9    go to visit the gift shop?  And we asked people that

10   were just interviewed in the gift shop, were they

11   also visiting the restaurant.

12          So the first numbers that you see in this

13   paragraph represent where they were interviewed.

14   The second number is a cross of these two, and that

15   is where we came up with those numbers.

16          Do you want to try to recalculate it

17   again?

18      Q.    If you can do it, because in looking at

19   your numbers, I couldn't.

20      A.    All right.  We'll take --

21          It is a computer analysis, so it is

22   possible that we can do it this way.

23      Q.    Well, without actually doing the numbers,

24   so, of the 85.9 percent that you interviewed at the

25   restaurant, you asked them did you also visit the

102

1    gift shop?

2         A.    Correct.  And basically --  Yes, that's

3    correct.

4         Q.    And of the 14.1 percent you interviewed

5    at the gift shop --

6         A.    Right.

7         Q.    -- you asked them did they also visit the

8    restaurant?

9         A.    Right.

10        Q.    And the 95.8 percent is those, regardless

11   of where you interviewed them, who visited both

12   places?

13        A.    Yes, correct.

14              You can recalculate it, but it would take

15   me time to do it.  If it is critical, I can do it.

16   But that is correct.

17              If you will look, for example --  Take,

18   for example, the 14.1 percent which we just talked

19   about, the ones interviewed at the gift shop.

20        Q.    Right.

21        A.    And if you look at the computer printout,

22   page 8 --  No.  Let's see.

23        Q.    Page 9?

24        A.    Page 9.

25        Q.    Top?

1          A.     Yeah, page 9, you have --

2                 No, this is a different basis.  So you

3     can't do it.  You have to look at the computer, and

4     I can produce it for you.  The numbers are correct,

5     but --

6          Q.     Because the last two sentences read:

7                 "In fact, Table 1 reports that

8          95.8 percent of all respondents visited the

9          restaurant".

10                Which I understand being the

11    85.9 percent, plus that percentage --

12         A.     Correct.

13         Q.     -- of interviewees in the gift shop who

14    answered yes to that question?

15         A.     Yes, that's correct.

16         Q.     What I'm not understanding is the "in

17    other words" sentence.

18                "In other words, the study indicates that

19         only a very small number of visitors see the

20         gift shop without seeing the restaurant (in

21         this sample, less than 5 percent)."

22                Where do you --

23         A.     The 5 percent is the complement of the

24    95.8.  Because basically what happens here right now

25    is 95.8 percent of all the 384 people that we talked

104

1    to either visited the restaurant initially or

2    visited the gift shop and saw the restaurant.

3          So, basically what I'm saying here is in

4    this specific sample, to be exact, 4.2 percent

5    visited only the gift shop and told us they did not

6    visit the restaurant.

7    Q.    Okay.

8          (Discussion off the record.)

9          MR. FRIEDLAND:  Just so the record is

10         clear, we do object and intend to object at

11         the hearing to Dr. Sarel's qualifications as

12         an expert in this matter, and should you put

13         him on at a hearing, we'll make that objection

14         clear at that time.

15         MR. RODRIGUEZ:  Sure, and ditto for

16         Dr. Perlman.

17         (Discussion off the record.)

18         MR. RODRIGUEZ:  He is not a doctor.

19         Okay.  My apologies.  Mr. Perlman.

20         I gave him more credit than he deserved.

21         MR. FRIEDLAND:  Subject to anything that

22         may be raised in cross-examination, we have

23         nothing further of this witness.

24         MR. RODRIGUEZ:  Okay.  No questions.  We

25         do not waive.

105

1          Are you ordering it?

2          MR. FRIEDLAND:  Yes.

3          MR. RODRIGUEZ:  We'll take a copy.

4          (Thereupon, the taking of the deposition

5   was concluded at 12:40 p.m.)

6                          EXCEPT FOR ANY CORRECTIONS
                           MADE ON THE ERRATA SHEET BY
7                          ME, I CERTIFY THIS IS A TRUE
                           AND ACCURATE TRANSCRIPT.
8                          FURTHER DEPONENT SAYETH NOT.

9                          _____
                           DEPONENT
10
    STATE OF FLORIDA)
11                  )  SS:
    COUNTY  OF  DADE)
12

13          Sworn and subscribed to before me this

14   _____ day of January, 1998.

15   PERSONALLY KNOWN _____ OR I.D._____

16                          _____
                           Notary Public in and for
17                          the State of Florida at
                           Large.
18
    My commission expires:
19

20

21

22

23

24

25

106

1                      CERTIFICATE OF OATH

2        STATE OF FLORIDA        )
                                 ) SS:
3        COUNTY OF MIAMI-DADE)

4             I, NANCY GILBERT, RPR-CP, Notary Public in and
         for the State of Florida at Large, certify that the
5        witness, DAN SAREL, personally appeared before me
         and was duly sworn.

6

7             WITNESS my hand and official seal this 7th day
         of January, 1998.

8            NANCY GILBERT
         MY COMMISSION # CC432672 EXPIRES    _____
9        February 4, 1999                    NANCY GILBERT, RPR-CP, Notary
         BONDED THRU TROY FAIN INSURANCE, INC.    Public, State of Florida

10

11                  REPORTER'S DEPOSITION CERTIFICATE

12       STATE OF FLORIDA        )
                                 ) SS:
13       COUNTY OF MIAMI-DADE)

14            I, NANCY GILBERT, Registered Professional
         Reporter, certify that I was authorized to and did
15       stenographically report the deposition of DAN SAREL,
         the witness herein; that a review of the transcript
16       was requested; that the foregoing pages numbered
         from 1 to 106, inclusive, is a true and complete
17       record of my stenographic notes of the deposition by
         said witness; and that this computer-assisted
18       transcript was prepared by me and/or under my
         supervision.

19

20            I further certify that I am not a relative,
         employee, attorney or counsel of any of the parties,
21       nor am I a relative or employee of any of the
         parties' attorney or counsel connected with the
22       action.

23            DATED this 7th day of January, 1998.

24                                _____
                                  NANCY GILBERT, RPR-CP

25

PEGGY ANN COOK & ASSOCIATES, INC.
150 S.E. Second Avenue
Suite 1011
Miami, Florida 33131-1500
(305)371-1884

January 7, 1998

Dr. Dan Sarel
c/o Holland & Knight
Attn:  Wilfredo A. Rodriguez, Esquire
701 Brickell Avenue, 30th Floor
Miami, FL  33131

**RE:  CARUSO v ESTEFAN, #97-2993-CIV-KING**

Dear Dr. Sarel:

This letter is to advise you that the transcript
of the **deposition of DAN SAREL**
taken in the above-styled cause on January 7,
1998 is completed and awaiting reading and signing.

Please arrange to stop by our office in Suite
1011, 150 S.E. Second Avenue, Miami, Florida
to read and sign this transcript.  Office hours
are from 8:00 a.m. to 4:00 p.m. Monday through
Friday.  The transcript 106 pages in length
and you should allow yourself sufficient time.

If the reading and signing has not been
completed prior to ** we shall
conclude that you have waived the reading and
signing of the deposition transcript.  Your
prompt attention to this matter is appreciated.

Sincerely,

NANCY GILBERT, RPR-CP

cc: Original Transcript
    Mr. Friedland
    Mr. Rodriguez

**DUE TO PRELIMINARY INJUNCTION HEARING, ORIGINAL
   TRANSCRIPT NOT BEING HELD - CONTACT ATTORNEYS TO
   READ THEIR COPY - SUBMIT ANY ERRATA TO ATTORNEYS
   DIRECTLY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

MICHAEL CARUSO & CO., INC.      )
                                )
        Plaintiff,              )
                                )
v.                              )       CIVIL ACTION NO. 97-2993-CIV-KING
                                )       MAGISTRATE JUDGE TURNOFF
ESTEFAN ENTERPRISES, INC. and   )
BONGOS CUBAN CAFE, INC.,        )
                                )
        Defendants.             )
_____ )

### NOTICE OF DEPOSITION OF DAN SAREL

TO:    Wilfredo A. Rodriguez, Esq.
       Holland & Knight
       701 Brickell Avenue
       30th Floor
       Miami, Florida 33131

        PLEASE TAKE NOTICE that the undersigned attorneys will take the deposition of
**DAN SAREL** on Wednesday, January 7, 1998, at 1:30 P.M.  The deposition will be conducted
at the offices of Lott & Friedland, 255 Alhambra Circle, Suite 555, Coral Gables, Florida, before a
Notary Public or other officer authorized to take depositions in the State of Florida, and will
continue from day to day until completed.  The deposition is being taken for the purpose of
discovery, for use at trial, and for such other purposes as are permitted under the federal rules of
procedure and evidence.

        Pursuant to the provisions of Rule 34, Fed.R.Civ.P., the witness is requested to
produce those documents and things responsive to "Exhibit A" to this deposition notice at the time
and location of the deposition.

Date:  **December 30, 1997**                    **LOTT & FRIEDLAND, P.A.**

                                                David K. Friedland
                                                _____
                                                By:   David K. Friedland
                                                      Florida Bar No. 833479
                                                      255 Alhambra Circle
                                                      Suite 555 (zip code:  33134)
                                                      Post Office Drawer 141098
                                                      Coral Gables, Florida  33114
                                                      (305) 448-7089
                                                      (305) 446-6191 telecopier


EXHIBIT
Sarel #1
Nmg 1-7-98

CIVIL ACTION NO. 97-2993-CIV-KING
MAGISTRATE JUDGE TURNOFF

Gary S. Phillips
9777 Wilshire Boulevard
Suite 805
Beverly Hills, California  90064
(310) 278-9787
(310) 278-4805 telecopier

Attorneys for Plaintiff
Michael Caruso & Co., Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing **NOTICE OF DEPOSITION OF DAN SAREL** is being served upon Defendants Estefan Enterprises, Inc. and Bongos Cuban Cafe, Inc. by delivering a true and correct copy of same to counsel for Defendants, as follows:

Wilfredo A. Rodriguez, Esq.
Holland & Knight
701 Brickell Avenue
30th Floor
Miami, Florida  33131

via telecopier and United States First Class Mail, in a postage-paid envelope, on **December 30, 1997**.

**DAVID K. FRIEDLAND**

2

## Exhibit A

In accordance with the provisions of Rule 34, Federal Rules of Civil Procedure, the witness is hereby requested to produce the following documents and things for inspection and copying, at the time and location designated in the notice compelling the witness to appear for deposition and produce documents.

1. All documents which refer or relate to the background of the witness, in general, in market research and trademark law, in particular, and with regard to restaurant services and clothing products.

2. All documents which refer or relate to any information sought or reviewed by the witness in designing his marketing survey.

3. Any documents referring or relating to any evidentiary survey conducted by the witness, including without limitation all documents which refer or relate to the objectives, design, questionnaires, study instructions, code development, tabulations, analysis, conclusions, results, and/or report.

4. Any documents which refer or relate to the witness' rationale for each element of the evidentiary survey design, including without limitation the universe, sampling method, survey setting, each question, method of execution (i.e., cities, agencies), code used in tabulating data, analysis, and conclusion.

5. All documents which refer or relate to the identification of the individual or individuals who defined the evidentiary survey objectives, designed the survey, drafted the questionnaires, wrote the study instructions, developed the code for tabulation, tabulated the completed questionnaires, created the tabular format for presenting the data, performed the statistical analysis, drew the conclusions from the data, and wrote the report to be submitted as evidence.

6. All documents which refer or relate to the exact stimuli used in the evidentiary survey, if any.

7. All documents which refer or relate to the identification of interviewing agencies used for evidentiary survey.

8. Any recordings or video tapes related to the evidentiary survey.

9. Any documents, stimuli, recordings, or video tapes relating to consumer interviews involving the marks at issue done in anticipation of litigation or after the complaint was filed (i.e. pretests, aborted surveys, surveys with unfavorable results or the like), including all documents which refer or relate to the objectives, design, questionnaires, study instructions, tabulations and conclusions of such consumer interviews.

# UNIVERSITY OF MIAMI

## Curriculum Vitae

1. Date: December 19, 1997

## PERSONAL

2.  Name: Dan Sarel

3a. Home Phone: 251-6005        3b. Office Phone: 284-1772

4.  Home Address: 10100 S.W. 142nd Street, Miami, FL 33176

5.  Employment Status: Full-time

6.  Current Academic Rank: Associate Professor

7.  Primary Department: Marketing

8.  Citizenship: USA

## HIGHER EDUCATION

10. Institutional

   Doctor of Business Administration - Graduate School of Business Administration
   Harvard University, November, 1978

   Post-Graduate Studies - Graduate School of Management
   University of California at Los Angeles, 1975

   Master of Business Administration - (with distinction-highest honors),
   Hebrew University of Jerusalem, 1974

   Bachelor of Arts - (with distinction-highest honors) in Economics
   Hebrew University of Jerusalem, 1972

## EXPERIENCE

13. Instructional:

   School of Business Administration, University of Miami
   Associate Professor, 1983-present

   School of Business Administration, University of Miami
   Assistant Professor, 1981-1983



EXHIBIT
Sarel #2
PENGAD-Bayonne, N.J.
Nmg 1-798

School of Business Administration, University of Connecticut
Assistant Professor, 1978-1981

School of Business Administration, Northeastern University
Instructor, 1978

14. Professional:

Harvard Business School
Research and Case Development, 1977

Jerusalem Institute of Management
Research and Course Development, 1976

Graduate School of Management, University of California at
Los Angeles, Research Assistant, 1975

Graduate School of Business Administration, Hebrew University
Research and Teaching Assistant, 1972-1974

Bank of Israel
Research Assistant, 1970-1971

15. Military:  Israeli Defense Army, 1966-1969

PUBLICATIONS

16.     Books and Monographs Published:
        Consumer Evaluation Strategies", Working Paper, HBS 78-17,
        School of Business Administration, Harvard University (1978).

        D.B.A. - An Investigation of the Effect of Risky Attributes on
        Consumer Evaluation Strategies.  Chairman, Professor David J.
        Reibstein (Boston, 1978)

        M.B.A. - Consumer Store Loyalty - An Analysis in the Shoe and
        Furniture Industries.  Supervisor, Professor Arieh Goldman
        (Jerusalem, 1974)

17.     Juried or Refereed Journal Articles:

        "Managing the Delayed Service Encounter: The Role of Employee Action and Customer Prior
        Experience", *Journal of Services Marketing*, (forthcoming)(with H. Marmorstein).

"Market Expansion Strategies", *Health Care Business Digest*, (forthcoming) (with H. Marmorstein).

"Managing The Failed Service Encounter: How Employee Actions Affect Consumer Reponse to Delays," at the Sixth Annual AMA Frontiers in Services Conference, Nashville, TN October 1997 (witn H. Marmorsrein).

"Identifying New Patient Prospects: Efficacy of Usage Segmentation", *Journal of Health Care Marketing* (Winter 1996)(with H. Marmorstein).

"The Impact of Customer Satisfaction Based Incentive Systems on Salespeople's Customer Service Response: An Empirical Study", *Journal of Personnal Selling and Sales Management,* Vol. XV No. 3 (Summer 1995)(with A. Sharma).

"Examining the Effectiveness of Service Guarantees: The Role of Process, Specificity, and Prior Experience", European Marketing Conference, Copenhagen May 1995 (with W. Lassar, H. Marmorstein).

"Expanding the Market for 'Unsought' Services: The Efficacy of Usage-Based Segmentation", at the AMA Frontiers in Services Conference, Nashville, TN October 1994 (witn H. Marmorsrein).

"An Analysis of Advertisements in the Journal of the American Academy of Dermatology 1980 & 1990", Journal of the American Academy of Dermatology, 1993(with D.J. Hogan et. al.).

"Linking Employee Compensation to Customer Satisfaction - an Exploratory study" at the AMA Frontiers in Services Conference, Nashville, TN October 1993 (witn A.Sharma).

"Customer and Non-Customer Perceptions of Third Party Services: Are They Similar". The International Journal of Logistics Management, Vol. 3, No. 1, 1992, pp. 12-21.

"Service Quality and Customer  Satisfaction Monitoring Systems:  An exploratory Analysis". Presented at the AMA  Service Marketing Conference "Frontiers  in Services", Nashville, TN 1992.

"The Influence of Type of Advertisement, Price and  Source  Credibility on Perceived Quality", Journal of the Academy of Marketing  Science,  Vol 20  No. 3, 1992 (with J. Gotlieb).

"Comparative Advertising Effectiveness: The Role of Involvement and Source Credibility" Journal of Advertising, Vol. 29 No. 1 (1991) pp. 38-45 (with J. Gotlieb).

"Perceived Quality and Consumer Satisfaction:"Effects of Price Advertisements on Perceived-Quality of Purchase Intentions", Journal of Business Research, Vol. 22 No.3 (May 1991) pp. 195-210 (with J. Gotlieb).

"Measuring Perceived Quality and Satisfaction:  The Experience of the Cruise Line Industry", Travel and Tourism in Transition: The Research Challenge, ESOMAR, Dublin (May 1991) pp. 129-142.

"Cruise Industry in the USA: Matching Supply and Demand by 1990", The Economist Travel and Tourism Analyst, August, 1986, pp. 43-52 (with J. Lewis).

"Characteristic of Radio Commercials and their Recall Effectiveness", Journal of Marketing Vol. 50 (January 1986), pp. 52-60 (with M. Sewall).

This article is reprinted in Bellur, Berkman and Lee, Readings In Advertising, University Publisher and Printer, Hong Kong (1986).

"Decisions to Adopt New Medical Technologies:  A Case Study of Thrombolytic Therapy", Social Science and Medicine, Vol. 21, No. 3, pp. 291-298 (with D. Becker and L.B. Gardner).

"A Comparative Analysis of Models of Consumer Decision Under Risk", 1984 Southern Marketing Association.

"Trends in Factual Claims in Magazine Ads:  1958, 1968, 1978", Journalism Quarterly, Vol. 61, No. 3 (Autumn 1984) pp. 650-654, 743.

This article is reprinted in Bellur, Berkman and Lee, Readings In Advertising, University Publisher and Printer, Hong Kong (1986).

"A Comment on a Model and Methodology for the Development of Consumer Information Programs", Journal of Marketing, Volume 47, No. 3 (Summer, 1983), p. 103-107.

"Choosing Between Discrete Marketing Policy Alternatives Under Uncertain Market Response Conditions", Journal of the Academy of Marketing Science, Volume 12, No. 3 (Winter, 1984), (with J. Yassour).

"Consumer (Mis) Perceptions and Usage of Certification Marks, 1972 and 1980:  Did Public Policy Have an Impact?", Journal of Marketing (Summer, 1981), (with M.V. Laric).

This article is reprinted in Bellur, Berkman and Lee, Readings In Advertising University Publisher and Printer, Hong Kong (1986).

"Using Cumulative Pretests Experiences to Improve the Effectiveness of Radio Commercials" (with M. Sewell) European Society for Opinion and Marketing Research, conference in Monte Carlo (Monaco) January 1983.  Published in ESOMAR's Seminar on Effective Advertising-Can Research Help? pp. 149-162.

"Food Shopping Behavior in Stagflationary Times: The Experience in the U.S.A." 1983 meeting of the International Association for Research in Economic Psychology in Bologna, Italy.

"Models of Behavioral Choice Under Risk; A Review", Proceedings of the 1982 Southern Marketing Association, November, 1982.

"Advances in Environmental Psychology - A New Perspective on Consumer Behavior", K. Bernhardt et. al. (eds)  The Changing Marketing Environment; New Theories and Application, American Marketing Association, 1981 (Annual Educators Conference) pp. 135-138.

"Consumer Evaluation Under Uncertainly: "Comparative Analysis of the Vector and Expected Utility Models". American Institute for Sciences proceedings of Western Division Conference, 1981.

"Preference Modeling of Managerial Marketing Decision Making", In:  D.B. Montgomery and D.R. Wittink (eds.), Marketing and Measurement Analysis  Marketing Science Institute Report No. 80-103, 1980, pp. 378-385 (Special ORSA/TIMS Conference on Market Measurement and Analysis), (With P. Cattin).

"An Exploratory Investigation of the Managerial Implications of `Generic' Brands", In:  R.P. Bagozzi et al (ed.).  Marketing into the 80's - Changes and Challenges, American Marketing Association, 1980, (Annual Educators Conference), (with M. Sewall).

"Product Positioning - A Reassessment", In:  C.W. Lamb, Jr. and P.M. Dunne (eds.). Theoretical Developments in Marketing, American Marketing Association, 1980, pp. 116-119 (Special Conference on Marketing Theory).

"Is Expected Utility a Descriptive Model of Consumer Decision Making Under Uncertainty?" In: H.S. Gitlow and E.W. Wheatley (eds.) Developments in Marketing Science, 1979, pp. 33- 37 (Annual Conference, Academy of Marketing Science).

"Meeting the Competitive Challenge:  A Search for New Strategies in Xerox", presented in the 1979 National Intercollegiate Case Clearing House (No. 9-580-672), (with M.V. Laric).

18.    Other Publications:

"What do Purchasers Really Want - Understanding Needs of Decision-Making Processes", Annual Meeting of Seatrade, Miami, Florida 1988.

"The Yacht-like Cruise Market", Annual Meeting of Seatrade, Miami, Florida 1987.

"A Comparative Analysis of Models of Consumer Decision Under Risk", University of Connecticut Working Paper, 1981.

"Consumers Perception and Use of Composite Information Measures-Empirical Findings and Policy Implications", Annual meeting of the European Economic Psychologists, Leuven Brussles, 1980.

"Modeling Marketing Managers' Decisions", University of Connecticut Working Paper, 1979, (with P. Cattin).

"Comments on Perceived Risk and Composition Models for Multi-Attribute Decisions", University of Connecticut Working Paper, 1979.
"Meeting the Competitive Challenge:  A Search for New Strategies in Xerox", presented in the 1979 National Conference of A.I.D.S. and distributed as a case by the Intercollegiate Case Clearing House (#9-580-672), (with M.V. Laric).

"Witco Chemical LTD (Israel) - A case developed for the Jerusalem Institute of Management. (1977).

"Iscar LTD (Israel)" - A case developed for the Jerusalem Institute of Management (1977).

"Envirodata" - A case developed at the Harvard Business School and distributed by the Intercollegiate case Clearing House (1977).

19.    OTHER WORK FOR PUBLICATION:

"Effective Monitoring  of Service Delivery" to be submitted to *Sloan Management Review.*(with H.Marmorstein).

"Effective Communication of Service Guarantees"  to be submitted to *Journal of Business Research* (with H.Marmorstein and W. Lassar)

"Customer Mix Management" to be submitted to the *Journal of Marketing* (with A.Parasuraman and H.Marmorstein)

20.    Editorial Responsibilities:

Reviewed papers for the Journal of Advertising, Journal of the Academy of Marketing Science, American Marketing Association, American Academy of Advertising, Southern Marketing Science.  Book review for Business Publications, Inc. Kent Publishing Company, Prentice Hall.

21.    PROFESSIONAL AND HONORARY ORGANIZATIONS:

American Marketing Association, 1978 to present
Association of Consumer Research, 1979 to 1985
American Institute of Decision Sciences, 1978 to 1985
European Economic Psychologists, 1980 to 1990
Travel Research Association, 1977 to 1992
American Academy of Marketing Science, 1978 to present

22.    HONORS AND AWARDS:

Outstanding Young Man of America - 1980
Hyman J. Shaber Fellowship -  1976/77
Graduate School of Business Administration, Harvard University
 Annual Fellowships - 1975/76, 1976/77, 1977/78
University of California at Los Angeles - International Students
 Exchange Fellowship - 1975
Graduate School of Business Administration, Hebrew University,
 Annual Fellowships - 1972/73, 1973/74
Faculty of Social Sciences, Hebrew University
 Annual Scholarships and Special Awards - 1970/71, 1971/72, 1972/73

23.    POST-DOCTORAL FELLOWSHIPS: None

24.    TEACHING SPECIALIZATION:

Services Marketing, Healthcare Marketing, Advertising

25.    RESEARCH PERFORMED:

"Consumer Feedback  Systems"

"Medical Advertising"

"Marketing Opportunities in the 50+ Market - A Framework for Action".

University of Miami Summer Research Support 1981, "Intertype Store Patronage and Consumers Shopping Behavior in Inflationary Times: The case of the Grocery Industry"

Marketing Science Institute: A grant for exploratory study on generic products (with Murphy A. Sewall), 1979.

University of Connecticut Research Foundation Award, 1979. "A Longitudinal Analysis of Communication Strategies in the Print Media".

"Characteristics Leading to Significant Differences in Recall Rates for Radio Commercials", sponsored by Radio Recall Research, Holmdel, New Jersey.

"Product Bundles - A Theoretical Examination (tentative title)", first draft was written.

"Modeling Behavioral Decisions:  A Review", first draft was written (with P. Cattin).

Other Research see Nos:  16, 17, 18, 19.

26.    THESIS AND DISSERTATION ADVISING:

Executive MBA Graduate Thesis Advising, University of Miami, 1983 - present.

Graduate Thesis advising University of Connecticut, 1979 - 1981.

27.   UNIVERSITY COMMITTEE AND ADMINISTRATIVE RESPONSIBILITIES:

University of Miami:
University Level
Graduate School Member
Accreditation Review Committee Member
Technical Support Committee Member

School of Business Level
School Council Member 1982 - 1986, 1996 -present
Gold Fund Member 1986 - 1995
Ph.D. Committee member 1986 - 1990

Faculty Advisory Committee  1990 - present
Master of Science in Quality Planning
Committee  1991 - present
MBA Enhancement Committee 1991 - 1992
Department of Marketing
Recruiting Committee Member
Advertising Major Committee Member

University of Connecticut Committee Work
Bowater Prize in Marketing-Chairperson
Marketing Internship - Chairperson
Undergraduate Curriculum and Courses - Member
Marketing Research Forum - Member

28.   COMMUNITY ACTIVITIES:

Voluntary Marketing Consultant for Windham Hospital, and the New England J.N.F.

Small Business Administration programs - presentations, Metro Dade County - Selection
Committees

Bet Shira School - Board of Education Member

29.   OTHER PROFESSIONAL INFORMATION OR ACTIVITIES:

Presentation before the Life Insurance Marketing Research Association, Hartford, Connecticut,
1979.

Coauthored a paper presented by P. Cattin, at a marketing research conference, Brussels,
Belgium, March 1979.

Comoderator of sessions in the Fifth and Sixth Annual Conferences on Strategic Planning cosponsored by the American Marketing Association and the University of Connecticut.

Presentation at the 1980 Marketing Research Forum organized by the University of Connecticut for marketing executives.

Institute De Estudios Superiores de Administracion (IESA) Caracas, Venezuela, Summer 1983 - taught an Executive Course in Advertising.

In-House Presentation for  Corporate  Affiliates  1991

Presentation at the UM  Quality Day entitled, "Market  Driven Quality - The Voice of the Customer"

Key note speaker at the Florida International Bankers Association meeting held by the Supporting Members on Service Marketing -  Competing Through Quality and long Term Relations.

Dade County Court System: Expert witness testimonies.

Guest Speaker - A variety of local and national companies

Media Exposure - interviewed by local and national newspapers, magazines, radio and television. Comments sought on a variety of marketing issues with special emphasis on the travel industry.

Marketing Consultant to a variety of local, national, and international companies.

# UNIVERSITY OF MIAMI

## Curriculum Vitae

1. Date:  August 19, 1997

## PERSONAL

2. Name:  Dan Sarel

3a. Home Phone:  251-6005          3b. Office Phone:  284-1772

4. Home Address:  10100 S.W. 142nd Street, Miami, FL  33176

5. Employment Status:  Full-time

6. Current Academic Rank:  Associate Professor

7. Primary Department  Marketing

8. Citizenship: USA

## HIGHER EDUCATION

10. Institutional

Doctor of Business Administration - Graduate School of Business Administration
Harvard University, November, 1978

Post-Graduate Studies - Graduate School of Management
University of California at Los Angeles, 1975

Master of Business Administration - (with distinction-highest honors)
Hebrew University of Jerusalem, 1974

Bachelor of Arts - (with distinction-highest honors) in Economics
Hebrew University of Jerusalem, 1972

## EXPERIENCE

13. Instructional:

School of Business Administration, University of Miami
Associate Professor, 1983-present

School of Business Administration, University of Miami
Assistant Professor, 1981-1983



EXHIBIT

Sarel #3

NMG 1-7-98

School of Business Administration, University of Connecticut
Assistant Professor, 1978-1981

School of Business Administration, Northeastern University
Instructor, 1978

14. Professional:

Harvard Business School
Research and Case Development, 1977

Jerusalem Institute of Management
Research and Course Development, 1976

Graduate School of Management, University of California at
Los Angeles, Research Assistant, 1975

Graduate School of Business Administration, Hebrew University
Research and Teaching Assistant, 1972-1974

Bank of Israel
Research Assistant, 1970-1971

15. Military: Israeli Defense Army, 1966-1969

PUBLICATIONS

16. Books and Monographs Published:
Consumer Evaluation Strategies", Working Paper, HBS 78-17,
School of Business Administration, Harvard University (1978).

D.B.A. - An Investigation of the Effect of Risky Attributes on
Consumer Evaluation Strategies. Chairman, Professor David J.
Reibstein (Boston, 1978)

M.B.A. - Consumer Store Loyalty - An Analysis in the Shoe and
Furniture Industries. Supervisor, Professor Arieh Goldman
(Jerusalem, 1974)

17. Juried or Refereed Journal Articles:

"Managing the Delayed Service Encounter: The Role of Employee Action and Customer Prior
Experience", *Journal of Services Marketing*, (forthcoming)(with H. Marmorstein).

"Managing The Failed Service Encounter: How Employee Actions Affect Consumer Reponse to Delays," at the Sixth Annual AMA Frontiers in Services Conference, Nashville, TN October 1997 (witn H. Marmorstein).

"Identifying New Patient Prospects: Efficacy of Usage Segmentation", *Journal of Health Care Marketing* (Winter 1996)(with H. Marmorstein).

"The Impact of Customer Satisfaction Based Incentive Systems on Salespeople's Customer Service Response: An Empirical Study", *Journal of Personnal Selling and Sales Management,* Vol. XV No. 3 (Summer 1995)(with A. Sharma).

"Examining the Effectiveness of Service Guarantees: The Role of Process, Specificity, and Prior Experience", European Marketing Conference, Copenhagen May 1995 (with W. Lassar, H. Marmorstein).

"Expanding the Market for 'Unsought' Services: The Efficacy of Usage-Based Segmentation", at the AMA Frontiers in Services Conference, Nashville, TN October 1994 (witn H. Marmorstein).

"An Analysis of Advertisements in the Journal of the American Academy of Dermatology 1980 & 1990", *Journal of the American Academy of Dermatology,* 1993(with D.J. Hogan et. al.).

"Linking Employee Compensation to Customer Satisfaction - an Exploratory study" at the AMA Frontiers in Services Conference, Nashville, TN October 1993 (witn A.Sharma).

"Customer and Non-Customer Perceptions of Third Party Services: Are They Similar". The *International Journal of Logistics Management,* Vol. 3, No. 1, 1992, pp. 12-21.

"Service Quality and Customer Satisfaction Monitoring Systems: An exploratory Analysis". Presented at the AMA Service Marketing Conference "Frontiers in Services", Nashville, TN 1992.

"The Influence of Type of Advertisement, Price and Source Credibility on Perceived Quality", *Journal of the Academy of Marketing Science,* Vol 20 No. 3, 1992 (with J. Gotlieb).

"Comparative Advertising Effectiveness: The Role of Involvement and Source Credibility" *Journal of Advertising,* Vol. 29 No. 1 (1991) pp. 38-45 (with J. Gotlieb).

"Perceived Quality and Consumer Satisfaction:"Effects of Price Advertisements on Perceived-Quality of Purchase Intentions", *Journal of Business Research,* Vol. 22 No.3 (May 1991) pp. 195-210 (with J. Gotlieb).

"Measuring Perceived Quality and Satisfaction: The Experience of the Cruise Line Industry", *Travel and Tourism in Transition: The Research Challenge,* ESOMAR, Dublin (May 1991) pp. 129-142.

"Cruise Industry in the USA: Matching Supply and Demand by 1990", The Economist Travel and Tourism Analyst, August, 1986, pp. 43-52 (with J. Lewis).

"Characteristic of Radio Commercials and their Recall Effectiveness", Journal of Marketing Vol. 50 (January 1986); pp. 52-60 (with M. Sewall).

This article is reprinted in Bellur, Berkman and Lee, Readings In Advertising, University Publisher and Printer, Hong Kong (1986).

"Decisions to Adopt New Medical Technologies: A Case Study of Thrombolytic Therapy", Social Science and Medicine, Vol. 21, No. 3, pp. 291-298 (with D. Becker and L.B. Gardner).

"A Comparative Analysis of Models of Consumer Decision Under Risk", 1984 Southern Marketing Association.

"Trends in Factual Claims in Magazine Ads: 1958, 1968, 1978", Journalism Quarterly, Vol. 61, No. 3 (Autumn 1984) pp. 650-654, 743.

This article is reprinted in Bellur, Berkman and Lee, Readings In Advertising, University Publisher and Printer, Hong Kong (1986).

"A Comment on a Model and Methodology for the Development of Consumer Information Programs", Journal of Marketing, Volume 47, No. 3 (Summer, 1983), p. 103-107.

"Choosing Between Discrete Marketing Policy Alternatives Under Uncertain Market Response Conditions", Journal of the Academy of Marketing Science, Volume 12, No. 3 (Winter, 1984), (with J. Yassour).

"Consumer (Mis) Perceptions and Usage of Certification Marks, 1972 and 1980: Did Public Policy Have an Impact?", Journal of Marketing (Summer, 1981), (with M.V. Laric).

This article is reprinted in Bellur, Berkman and Lee, Readings In Advertising University Publisher and Printer, Hong Kong (1986).

"Using Cumulative Pretests Experiences to Improve the Effectiveness of Radio Commercials" (with M. Sewell) European Society for Opinion and Marketing Research, conference in Monte Carlo (Monaco) January 1983. Published in ESOMAR's Seminar on Effective Advertising-Can Research Help? pp. 149-162.

"Food Shopping Behavior in Stagflationary Times: The Experience in the U.S.A." 1983 meeting of the International Association for Research in Economic Psychology in Bologna, Italy

"Models of Behavioral Choice Under Risk; A Review", Proceedings of the 1982 Southern Marketing Association, November, 1982.

"Advances in Environmental Psychology - A New Perspective on Consumer Behavior", K. Bernhardt et. al. (eds) The Changing Marketing Environment: New Theories and Application, American Marketing Association, 1981 (Annual Educators Conference) pp. 135-138.

"Consumer Evaluation Under Uncertainty: "Comparative Analysis of the Vector and Expected Utility Models". American Institute for Sciences proceedings of Western Division Conference, 1981.

"Preference Modeling of Managerial Marketing Decision Making", In: D.B. Montgomery and D.R. Wittink (eds.), Marketing and Measurement Analysis Marketing Science Institute Report No. 80-103, 1980, pp. 378-385 (Special ORSA/TIMS Conference on Market Measurement and Analysis); (With P. Cattin).

"An Exploratory Investigation of the Managerial Implications of `Generic' Brands", In: R.P. Bagozzi et al (ed.). Marketing into the 80's - Changes and Challenges, American Marketing Association, 1980, (Annual Educators Conference), (with M. Sewall).

"Product Positioning - A Reassessment", In: C.W. Lamb, Jr. and P.M. Dunne (eds.). Theoretical Developments in Marketing, American Marketing Association, 1980, pp. 116-119 (Special Conference on Marketing Theory).

"Is Expected Utility a Descriptive Model of Consumer Decision Making Under Uncertainty?" In: H.S. Gitlow and E.W. Wheatley (eds.) Developments in Marketing Science, 1979, pp. 33- 37 (Annual Conference, Academy of Marketing Science).

"Meeting the Competitive Challenge: A Search for New Strategies in Xerox", presented in the 1979 National Intercollegiate Case Clearing House (No. 9-580-672), (with M.V. Laric).

18. Other Publications:

"What do Purchasers Really Want - Understanding Needs of Decision-Making Processes", Annual Meeting of Seatrade, Miami, Florida 1988.

"The Yacht-like Cruise Market", Annual Meeting of Seatrade, Miami, Florida 1987.

"A Comparative Analysis of Models of Consumer Decision Under Risk", University of Connecticut Working Paper, 1981.

"Consumers Perception and Use of Composite Information Measures-Empirical Findings and Policy Implications", Annual meeting of the European Economic Psychologists, Leuven Brussles, 1980.

"Modeling Marketing Managers' Decisions", University of Connecticut Working Paper, 1979, (with P. Cattin).

"Comments on Perceived Risk and Composition Models for Multi-Attribute Decisions", University of Connecticut Working Paper, 1979.

"Meeting the Competitive Challenge: A Search for New Strategies in Xerox", presented in the 1979 National Conference of A.I.D.S. and distributed as a case by the Intercollegiate Case Clearing House (#9-580-672); (with M.V. Laric).

"Witco Chemical LTD (Israel) - A case developed for the Jerusalem Institute of Management. (1977).

"Iscar LTD (Israel)" - A case developed for the Jerusalem Institute of Management (1977).

"Envirodata" - A case developed at the Harvard Business School and distributed by the Intercollegiate case Clearing House (1977).

19.   OTHER WORK FOR PUBLICATION:

"Effective Monitoring of Service Delivery" to be submitted to *Sloan Management Review*. (with H. Marmorstein).

"Effective Communication of Service Guarantees" to be submitted to *Journal of Business Research* (with H. Marmorstein and W. Lassar)

"Customer Mix Management" to be submitted to the *Journal of Marketing* (with A. Parasuraman and H. Marmorstein)

20.   Editorial Responsibilities:

Reviewed papers for the Journal of Advertising, Journal of the Academy of Marketing Science, American Marketing Association, American Academy of Advertising, Southern Marketing Science. Book review for Business Publications, Inc. Kent Publishing Company, Prentice Hall.

21.   PROFESSIONAL AND HONORARY ORGANIZATIONS:

American Marketing Association, 1978 to present
Association of Consumer Research, 1979 to 1985
American Institute of Decision Sciences, 1978 to 1985
European Economic Psychologists, 1980 to 1990
Travel Research Association, 1977 to 1992
American Academy of Marketing Science, 1978 to present

22.   HONORS AND AWARDS:

Outstanding Young Man of America - 1980
Hyman J. Shaber Fellowship - 1976/77
Graduate School of Business Administration, Harvard University

Annual Fellowships - 1975/76, 1976/77, 1977/78
University of California at Los Angeles - International Students
Exchange Fellowship - 1975
Graduate School of Business Administration, Hebrew University,
Annual Fellowships - 1972/73, 1973/74
Faculty of Social Sciences, Hebrew University
Annual Scholarships and Special Awards - 1970/71, 1971/72, 1972/73

23.   POST-DOCTORAL FELLOWSHIPS: None

24.   TEACHING SPECIALIZATION:

Services Marketing, Healthcare Marketing, Advertising

25.   RESEARCH PERFORMED:

"Consumer Feedback Systems"

"Medical Advertising"

"Marketing Opportunities in the 50+ Market - A Framework for Action".

University of Miami Summer Research Support 1981, "Intertype Store Patronage and
Consumers Shopping Behavior in Inflationary Times: The case of the Grocery Industry"

Marketing Science Institute: A grant for exploratory study on generic products (with
Murphy A. Sewall), 1979.

University of Connecticut Research Foundation Award, 1979. "A Longitudinal Analysis
of Communication Strategies in the Print Media".

"Characteristics Leading to Significant Differences in Recall Rates for Radio
Commercials", sponsored by Radio Recall Research, Holmdel, New Jersey.

"Product Bundles - A Theoretical Examination (tentative title)", first draft was written.

"Modeling Behavioral Decisions: A Review", first draft was written (with P. Cattin).

Other Research see Nos: 16, 17, 18, 19.

26.   THESIS AND DISSERTATION ADVISING:

Executive MBA Graduate Thesis Advising, University of Miami, 1983 - present.

Graduate Thesis advising University of Connecticut, 1979 - 1981.

Graduate Thesis advising University of Connecticut, 1979 - 1981.

27.   UNIVERSITY COMMITTEE AND ADMINISTRATIVE RESPONSIBILITIES:

University of Miami:
University Level
Graduate School Member
Accreditation Review Committee Member
Technical Support Committee Member

School of Business Level
School Council Member 1982 - 1986, 1996 -present
Gold Fund Member 1986 - present
Ph.D. Committee member 1986 - 1990

Faculty Advisory Committee  1990 - present
Master of Science in Quality Planning
Committee  1991 - present
MBA Enhancement Committee 1991 - 1992
Department of Marketing
Recruiting Committee Member
Advertising Major Committee Member

University of Connecticut Committee Work
Bowater Prize in Marketing-Chairperson
Marketing Internship - Chairperson
Undergraduate Curriculum and Courses - Member
Marketing Research Forum - Member

28.   COMMUNITY ACTIVITIES:

Voluntary Marketing Consultant for Windham Hospital, and the New England J.N.F.

Small Business Administration programs - presentations, Metro Dade County - Selection
Committees

Bet Shira School - Board of Education Member

29.   OTHER PROFESSIONAL INFORMATION OR ACTIVITIES:

Presentation before the Life Insurance Marketing Research Association, Hartford, Connecticut,
1979.

Coauthored a paper presented by P. Cattin, at a marketing research conference, Brussels,
Belgium, March 1979.

Comoderator of sessions in the Fifth and Sixth Annual Conferences on Strategic Planning cosponsored by the American Marketing Association and the University of Connecticut.

Presentation at the 1980 Marketing Research Forum organized by the University of Connecticut for marketing executives.

Institute De Estudios Superiores de Administracion (IESA) Caracas, Venezuela, Summer 1983 - taught an Executive Course in Advertising.

In-House Presentation for  Corporate  Affiliates  1991

Presentation at the UM  Quality Day entitled, "Market  Driven Quality - The Voice of the Customer"

Key note speaker at the Florida International Bankers Association meeting held by the Supporting Members on Service Marketing -  Competing Through Quality and long Term Relations,

Dade County Court System: Expert witness testimonies.

Guest Speaker - A variety of local and national companies

Media Exposure - interviewed by local and national newspapers, magazines, radio and television. Comments sought on a variety of marketing issues with special emphasis on the travel industry.

Marketing Consultant to a variety of local, national, and international companies.

# BRAND PERCEPTIONS STUDY:

# THE VOICE OF THE CUSTOMER

Conducted For:

## BONGOS CUBAN CAFE

by:

## DR. DAN SAREL

January 5, 1998

Dr. Dan Sarel
Marketing Research, Consultation, Strategic Planning
10100 S.W. 142nd Street
Miami, Florida 33176



EXHIBIT

Sarel #4

Nmu 1-7-98

## TABLE OF CONTENT

1. Executive summary

2. Objectives and methodology

3. Key findings and analysis

4. Statistical distribution

   Appendix: survey instrument

# 1. EXECUTIVE SUMMARY

Dr. Dan Sarel is an independent marketing consultant and a marketing professor at the University of Miami School of Business. Dr. Sarel was commissioned to conduct a marketing survey of BONGOS CUBAN CAFE customers. The objective of the study is to assess whether customers of BONGOS CUBAN CAFE are associating or seeing a connection between BONGOS CUBAN CAFE and plaintiff's brand. A market study was designed and implemented to meet the stated objectives.

Customers for this study were defined as people (not associated with plaintiff or defendant) visiting BONGOS CUBAN CAFE restaurant and/or gift shop. A 384 respondent sample was recruited and interviewed between 12/27/97 - 12/29/97 at BONGOS CUBAN CAFE restaurant and gift shop following established market research procedures. Interviews were conducted by a professional market research firm. None of the interviewers, supervisors or the person coding the surveys had any knowledge of the purpose of the study. The questionnaire used in the study was developed by Dr. Sarel. It is based on a now-standard survey format recommended by McCarthy. The format provides respondents multiple opportunities to indicate any association and/or relation between BONGOS CUBAN CAFE and the plaintiff's brand and products.

Based on all the data available, we can clearly conclude that no evidence of ownership by plaintiff, association with plaintiff or plaintiff's products, or any relations between BONGOS CUBAN CAFE and plaintiff, was found in this study. None of the participants in this study has mentioned plaintiff or plaintiff's products. It is very clear that these participants are not thinking about the plaintiff or its products in the context of the BONGOS CUBAN CAFE experience. Given the strength of these findings, i.e. that NO ONE mentioned plaintiff or its products, confusion between the two brands at the BONGOS CUBAN CAFE location is extremely unlikely. For all practical purposes we can state that customers of BONGOS CUBAN CAFE, as represented in this study, are not thinking about a relationship, an association, sponsorship or similarity between plaintiff's brand and BONGOS CUBAN CAFE.

2

## 2. OBJECTIVES AND METHODOLOGY

### Objectives

BONGOS CUBAN CAFE has commissioned Dr. Dan Sarel an independent marketing consultant and a marketing professor at the University of Miami School of Business, to conduct a marketing survey of its customers. The purpose of the study is to determine the likelihood of confusion between BONGOS CUBAN CAFE and the plaintiff's Bongo brand. Specifically, the objective of the study is to assess whether customers of BONGOS CUBAN CAFE are associating or seeing a connection between BONGOS CUBAN CAFE and plaintiff's brand. If an association would be found, it would indicate for customers of BONGOS CUBAN CAFE, their likelihood of confusion between the two brands.

### Methodology

To determine the likelihood of confusion a survey methodology was employed. The universe for the study was defined as customers of BONGOS CUBAN CAFE. More specifically, customers are defined as people (not associated with plaintiff or defendant) visiting BONGOS CUBAN CAFE restaurant and/or gift shop. To ensure that only customers of BONGOS CUBAN CAFE are included in the study, the survey was conducted on the BONGOS CUBAN CAFE premises. Every person that was selected met the definition of a customer.

The survey instrument was developed by Dr. Sarel following established marketing research practices. The questionnaire was based on a now-standard survey format recommended by McCarthy. The format provides respondents multiple opportunities to indicate any association and/or relation between BONGOS CUBAN CAFE and the plaintiff's brand and products. A copy of the survey instrument is included in the appendix.

To administer the survey, an independent marketing research firm was hired. The firm based in the Orlando area is Barbara Nolan Market Research. The firm has been in business for approximately 25 years and is regularly employed by many well known corporations. A supervisor was assigned to manage this process. No one at Barbara Nolan Market Research was informed about the purpose of this study. Interviewers were selected for the job by the supervisor. All interviewers were experienced in conducting intercept interviews. Interviewers did not know the purpose of the study and were not associated in any way with the sponsors of the study. Interviewers were instructed on how to conduct the study and were trained prior to executing the study. All instructions were developed by Dr. Sarel. Training for the interviewers was provided by the supervisor.

The sample was implemented following established procedures. Personal interviews were conducted during a three day period (12/27/97 - 12/29/97). During this period, interviewers were

3

positioned inside BONGOS CUBAN CAFE from twelve noon till approximately 8:30 p.m. each day. Interviewers were instructed to interview customers in the following order: a) immediately after finishing eating or shopping in the gift shop; b) while waiting inside restaurant before they are seated. The specific selection of respondents was random. Interviewers were told to follow these procedures:

1. Approach the first person available in the location stated above
2. If you approach adults, alternate between males and female respondents
3. If you approach parties that include teenaged kids (over 13 years old), alternate between adults and teenaged kids. Among teenaged kids alternate between males and females.
4. Approximately 90% of the time should be allocated to interviews at the restaurant, 10% (with a minimum of 50 surveys) for interviews at the gift shop.

The completed questionnaires were returned to Dr. sarel for coding and analysis. After reviewing the questionnaires, Dr. sarel developed a coding scheme. All open-ended questions were coded by Dr. Sarel's assistant. She had no knowledge about the purpose or goals of the study. Few unclear coding cases were discussed between Dr. Sarel and his assistant. In all cases there was a complete agreement on the final classifications. None of these cases involved any element even remotely connected to the plaintiff. The data were entered into a computer and analyzed by Dr. Sarel using the SPSS computer programs.

The following report is based on the data collected and analyzed using the procedures described above. The next section called 'key findings and analysis' describes the key findings in an essay and tabular format. A complete statistical distribution of all data is provided in the section following the key finding section.

4

## 3. KEY FINDINGS AND ANALYSIS

**Sample Composition**

The composition of respondents participating in this survey is described in Table 1. The sample consisted of 384 participants who were randomly selected during the interviewing period. The sample included a broad mix of respondents meeting the sampling objectives of the study. The sample was about equally divided between females and males. A wide range of age groups are represented. About one third of respondents are under 30 years old, and about 1/6 are teenagers. Approximately 3/4 of respondents were visitors to the Orlando area and about 1/4 were local residents. The large majority of respondents were first time visitors to BONGOS CUBAN CAFE (82.6%).

To ensure a full representation of the BONGOS CUBAN CAFE experience, respondents were interviewed at the restaurant as well as at the gift shop. Table 1 indicates that 85.9% of the participants were interviewed at the restaurant and 14.1% at the gift shop. This distribution provides sufficient representation to conduct an analysis of the gift shop experience. Please note that respondents interviewed at the gift shop could have also experienced the restaurant and vice a versa. In fact, Table 1 reports that 95.8% of all respondents visited the restaurant, and 49.2% visited (saw) the gift shop. In other words, the study indicates that only a very small number of visitors see the gift shop without seeing the restaurant (in this sample, less than 5%).

In conclusion, the sample provides a good representation of BONGOS CUBAN CAFE's customers during the interviewing period. It provides sufficient representation of the target population discussed above.

**Information Prior To Visit**

To investigate the level of familiarity with BONGOS CUBAN CAFE, respondents were first asked whether they heard about this business before coming today. Of all respondents 62.8% said they did hear about it, the remainder said "no" or "don't know". All those indicating some familiarity were then asked to indicate what exactly did they hear. Table 2 reports the results. The first column describes percentages based only on those who said 'yes' (i.e. heard about it before). In the second column, the percentages are based on all respondents.

The findings indicate that 40.2% of the 'yes' group heard something specific about the restaurant (e.g. good food, Cuban food, long lines, comments about the ambiance, etc.). Others just heard about in general from comments in the media (30.7%) or other people (14.5%). Specific mentions of Gloria and/or Emilio Estefan were made by 10.8% of this 'yes' group.

5

For the main purpose of this study, no one mentioned anything related to the plaintiff's brand. All the prior information was related to BONGOS CUBAN CAFE.

## Main Reason For Coming to BONGOS CUBAN CAFE

Next respondents were asked about the main reason for coming today to BONGOS CUBAN CAFE. The results are reported in Table 3. In order of importance, respondents came to BONGOS CUBAN CAFE because of a Cuban element/interest (26.0%), to eat/drink (23.7%), specifically to check it out (19.5%), or just happened to be in the area (12.0%). Less than 1% indicated "buying/shopping" as the main reason. One respondent answered "to buy bongos" and two indicated souvenirs. The analysis in table 3 of these two respondents revealed that they thought Gloria Estefan owned the place, and did not think BONGOS CUBAN CAFE was sponsored by another firm, or that it sold other products other than what is sold at the restaurant.

For the main purpose of this study, no one mentioned anything related to the plaintiff's brand. The reasons given were related to BONGOS CUBAN CAFE.

## Perceived Ownership of BONGOS CUBAN CAFE

Next respondents were asked: who do you think owns BONGOS CUBAN CAFE?  The results are reported in table 4. A large majority of respondents (78.9%) answered Gloria and/or Emilio Estefan.  The 'don't know' group were next (16.9%), followed by Disney (1.8%), Latin/Cuban person (1.6%), Estefan & Disney (0.5%). One respondent said "don't know, maybe bongos?".  An analysis of the answers given by this respondent indicates no mention of plaintiff's brand or products. BONGOS CUBAN CAFE was not associated with any other company, nor was it believed that it sold other products.

For the main purpose of this study, no one mentioned anything related to the plaintiff's brand. Almost 4 out of 5 respondents mentioned the Estefans as owners of BCC.

## Perceived Sponsorship or Association with Other Companies

Next respondents were asked: do you think that BONGOS CUBAN CAFE is sponsored by or is associated with any other company? The answers are reported in Table 5. Only 23.2% answered "yes", the rest were about equally divided between "no" (39.8%) and "don't know" (37.0%). Those who said "yes" were asked to name the company. The names are reported in Table 5. The first column describes the percentages based only on those who said 'yes' (i.e. BONGOS CUBAN CAFE is associated with another company). In the second column, the percentages are based on all respondents. The results indicate that Disney was mentioned by 61.8% of the 'yes' group (which translates into 14.3% of the total sample). All other mentions were limited to very few respondents. The "don't know" group was 25.8% of the 'yes' sample. No one mentioned the plaintiff's brand.

6

## Other Products Sold by the Business

Next respondents were asked: do you think this business sells any other products or services other than what is sold at the restaurant? The responses are reported in Table 6. Only 11.7% answered 'yes'. The large majority said "no" (62.2%) or "don't know" (26.0%).

Those respondents who said 'yes', believing the business sold other products or services, where asked to name these products and indicate where they were sold. The most common answer was music/entertainment (60.0% of the 'yes' base, which is equivalent to 7.0% of all respondents). The other categories were mentioned by a few respondents and are described in Table 6. Of all the respondents, six mentioned a t-shirt or a different type of clothing. Each of these cases was further analyzed to determine any potential for confusion and/or association with plaintiff's brand. Table 7 reports the detailed findings for each of these six cases. In examining each case it is very clear that none of these respondents were referring to or thinking about the plaintiff's brand. Five out of the six mentioned earlier in the interview that Gloria Estefan owned the BONGOS CUBAN CAFE. In terms of distribution outlets the answers consisted of; around Disney, at your other restaurants, and at gift shops. None of these six respondents mentioned a department store or other retailing stores. No one mentioned the plaintiff's brand as the name of the other company.

## Conclusions

Based on all the data available, we can clearly conclude that no evidence of ownership by plaintiff, association with plaintiff or plaintiff's products, or any relations between BONGOS CUBAN CAFE and plaintiff, was found in this study. None of the participants in this study has mentioned plaintiff or plaintiff's products. It is very clear that these participants are not thinking about the plaintiff or its products in the context of the BONGOS CUBAN CAFE experience. Given the strength of these findings, i.e. that NO ONE mentioned plaintiff or its products, confusion between the two brands at the BONGOS CUBAN CAFE location is extremely unlikely. For all practical purposes we can state that customers of BONGOS CUBAN CAFE, as represented in this study, are not thinking about a relationship, an association, sponsorship or similarity between plaintiff's brand and BONGOS CUBAN CAFE.

## TABLE 1

### SAMPLE COMPOSITION
Total Sample = 384

| Residence | | Age | |
|---|---|---|---|
| Visitor | 75.3% | less than 14 years | 4.9% |
| Orlando resident | 24.7% | 14-19 years | 12.2% |
| | 100% | 20-29 years | 16.4% |
| | | 30-39 years | 25.5% |
| Gender | | 40-49 years | 23.4% |
| Female | 48.4% | 50 and over | 17.4% |
| Male | 51.6% | | 100% |
| | 100% | | |

| Employed? | | Interview Location | |
|---|---|---|---|
| No | 24.0% | Restaurant | 85.9% |
| Yes | 76.0% | Gift shop | 14.1% |
| | 100% | | 100% |

| First time at (with a minimum of 50) BCC? visited.... | | | Overall percent |
|---|---|---|---|
| Yes | 82.6% | Restaurant | 95.8% |
| No | 17.4% | Gift shop | 49.2% |
| | 100% | | |

8

## TABLE 2

## INFORMATION PRIOR TO VISIT

*Q3. Have you heard about this business or this company, before coming in today?*

| | |
|---|---|
| No | 34.9% |
| Don't know | 2.3% |
| Yes | 62.8% |
| | 100% |

*Q3a. If yes: What exactly did you hear about it before coming in today?*

| | % based on yes | % based on all sample |
|---|---|---|
| Estefan | 10.8% | 6.8% |
| Comments in media | 30.7% | 19.3% |
| Word of mouth | 14.5% | 9.1% |
| About restaurant | 40.2% | 25.3% |
| Saw it in the past | 0.4% | 0.3% |
| No answer/don't remember | 3.3% | 2.1% |
| Didn't hear before | ----- | 37.2% |
| | 100% | 100% |

9

**TABLE 3**

**MAIN REASON FOR COMING TO BCC**

*Q4.  What was the main reason you came into BONGOS CUBAN CAFE today?*

|                          | Count | %      |
|--------------------------|-------|--------|
| Eat/drink                | 91    | 23.7%  |
| Cuban element/interest   | 100   | 26.0%  |
| Came because of others   | 28    | 7.3%   |
| Check it out             | 75    | 19.5%  |
| Was in area              | 46    | 12.0%  |
| Looking for activity     | 32    | 8.3%   |
| Buy bongos               | 1     | 0.3%   |
| Estefans                 | 9     | 2.3%   |
| Buy souvenirs            | 2     | 0.5%   |
|                          | 384   | 100%   |

Analysis of the 2 respondents who came to buy souvenirs

*Q5.     Who do you think owns BONGOS CUBAN CAFE?*
Case #116, #157:     Gloria Estefan

*Q6.     Do you think that BONGOS CUBAN CAFE is sponsored by or associated with any other company?*
Case #116, #157:     No

*Q7.     Do you think this business sells any other products or services other than what is sold here at the restaurant?*
Case #116, #157:     No

Conclusion: No confusion with plaintiff's brand in these two cases

10

## TABLE 4

## PERCEIVED OWNERSHIP OF BCC

*Q5.  Who do you think owns BONGOS CUBAN CAFE?*

|                              | Count | %     |
|------------------------------|-------|-------|
| Don't know                   | 65    | 16.9% |
| Estefans                     | 303   | 78.9% |
| Disney                       | 7     | 1.8%  |
| Estefan& Disney              | 2     | 0.5%  |
| Latin/Cuban person           | 6     | 1.6%  |
| Don't know, maybe bongos?    | 1     | 0.3%  |
|                              | 384   | 100%  |

Analysis of the respondent saying: "Don't know, maybe bongos?" (Case #110)

*Q5a.    Why do you say that:*   Because of the name

*Q6.     Do you think that BONGOS CUBAN CAFE is sponsored by or associated with any other company?*     No

*Q7.     Do you think this business sells any other products or services other than what is sold here at the restaurant?*   No

Conclusion: No confusion with plaintiff's brand in this case

11

## TABLE 5

### PERCEIVED SPONSORSHIP OR ASSOCIATION
### WITH OTHER COMPANIES

*Q6.*  *Do you think that BONGOS CUBAN CAFE is sponsored by or associated with any other company?*

| | |
|---|---|
| No | 39.8% |
| Don't know | 37.0% |
| Yes | 23.2% |
| | 100% |

*Q6a.*  *Of those who said yes: which company?*

| | % based 'yes' group | % based on total sample |
|---|---|---|
| Disney | 61.8% | 14.3% |
| Larios | 3.4% | 0.8% |
| Coca Cola | 2.2% | 0.5% |
| A restaurant group | 2.2% | 0.5% |
| Fisher family | 1.1% | 0.3% |
| General Mills | 1.1% | 0.3% |
| Someone in Miami | 1.1% | 0.3% |
| Estefans | 1.1% | 0.3% |
| Don't know | 25.8% | 6.0% |
| Didn't say 'yes' | ---- | 76.8% |
| | 100% | 100% |

12

## TABLE 6

### OTHER PRODUCTS SOLD BY THE BUSINESS

Q7.   *Do you think this business sells any other products or services other than what is sold here at the restaurant?*

| | |
|---|---|
| No | 62.2% |
| Don't know | 26.0% |
| Yes | 11.7% |
| | 100% |

Q6a.   *Of those who said yes: what other products or services?*

| | Count | % based on 'yes' | % based on total sample |
|---|---|---|---|
| Music/entertainment | 27 | 60.0% | 7.0% |
| T-shirts & other clothing | 6 | 13.3% | 1.6% |
| Liquor | 1 | 2.2% | 0.3% |
| Cuban products/cigars | 2 | 4.4% | 0.5% |
| Food | 2 | 4.4% | 0.5% |
| Bongos | 1 | 2.2% | 0.3% |
| No answer | 6 | 13.3% | 1.6% |
| Didn't say 'yes' | 339 | ------ | 88.3% |
| | 384 | 100% | 100% |

13

**TABLE 7**

**ANALYSIS OF OTHER CLOTHING PRODUCTS**

| Case# | Item (q7a) | Where sold? (q7b) | Who owns? (q5) | Company Association? (q6) | Company Name (q6a) |
|-------|------------|-------------------|----------------|---------------------------|--------------------|
| 176 | t-shirts | around Disney | Gloria Estefan | yes | don't remember |
| 178 | shirts & hats | don't know | Gloria | no | --------- |
| 179 | shirts & mugs | at your other restaurants | don't know | no | --------- |
| 205 | coats | gift shops | Gloria | no | ---------- |
| 216 | maybe clothes | gift shops | Gloria | no | ---------- |
| 307 | t-shirts & souvenirs | don't know | Gloria | yes | Disney |

Conclusion: No confusion with plaintiff's brand in any of these six cases

14

# 4. STATISTICAL DISTRIBUTION

The following pages (numbered 2 - 9) provide the complete statistical distribution of all analyzed questions as produced by the SPSS computer program.

15

02 Jan 98    DR. DAN SAREL:   BONGOS CUBAN CAFE SURVEY                    Page 2

LOCATION  Interview location

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| Restaurant | 1.00 | 330 | 85.9 | 85.9 | 85.9 |
| Gift shop | 2.00 | 54 | 14.1 | 14.1 | 100.0 |
| | Total | 384 | 100.0 | 100.0 | |

Mode        1.000

Valid cases    384    Missing cases    0

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q1       Visitor or Orlando resident?

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| Visitor | 1.00 | 289 | 75.3 | 75.3 | 75.3 |
| Resident | 2.00 | 95 | 24.7 | 24.7 | 100.0 |
| | Total | 384 | 100.0 | 100.0 | |

Mode        1.000

Valid cases    384    Missing cases    0

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q2       First time visiting this business?

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| Yes | 1.00 | 317 | 82.6 | 82.6 | 82.6 |
| No | 2.00 | 67 | 17.4 | 17.4 | 100.0 |
| | Total | 384 | 100.0 | 100.0 | |

Mode        1.000

Valid cases    384    Missing cases    0

02 Jan 98    DR. DAN SAREL:   BONGOS CUBAN CAFE SURVEY                    Page 3

Q3          Heard about business before?

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| No | 1.00 | 134 | 34.9 | 34.9 | 34.9 |
| D'ont know | 2.00 | 9 | 2.3 | 2.3 | 37.2 |
| Yes | 3.00 | 241 | 62.8 | 62.8 | 100.0 |
|  |  | ------- | ------- | ------- |  |
|  | Total | 384 | 100.0 | 100.0 |  |

Mode        3.000

Valid cases    384    Missing cases    0

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q3A         What did you hear before coming today?

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| Estefan | 1.00 | 26 | 6.8 | 10.8 | 10.8 |
| Media | 2.00 | 74 | 19.3 | 30.7 | 41.5 |
| WOM | 3.00 | 35 | 9.1 | 14.5 | 56.0 |
| Restaurant | 4.00 | 97 | 25.3 | 40.2 | 96.3 |
| Saw in past | 5.00 | 1 | .3 | .4 | 96.7 |
| No answer | 9.00 | 8 | 2.1 | 3.3 | 100.0 |
|  | .00 | 143 | 37.2 | Missing |  |
|  |  | ------- | ------- | ------- |  |
|  | Total | 384 | 100.0 | 100.0 |  |

Mode        4.000

Valid cases    241    Missing cases    143

02 Jan 98    DR. DAN SAREL:   BONGOS CUBAN CAFE SURVEY                    Page 4

Q4        Main reason for coming to BCC

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| Eat/drink | 1.00 | 91 | 23.7 | 23.7 | 23.7 |
| Cuban element | 2.00 | 100 | 26.0 | 26.0 | 49.7 |
| Because of others | 3.00 | 28 | 7.3 | 7.3 | 57.0 |
| Check it out | 4.00 | 75 | 19.5 | 19.5 | 76.6 |
| Was in area | 5.00 | 46 | 12.0 | 12.0 | 88.5 |
| Activity | 6.00 | 32 | 8.3 | 8.3 | 96.9 |
| Buy  bongos | 7.00 | 1 | .3 | .3 | 97.1 |
| Estefans | 8.00 | 9 | 2.3 | 2.3 | 99.5 |
| Buy souvenirs | 9.00 | 2 | .5 | .5 | 100.0 |
| | | ------- | ------- | ------- | |
| | Total | 384 | 100.0 | 100.0 | |

Mode        2.000

Valid cases    384    Missing cases    0

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q5        Who owns BCC?

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| Don't know | .00 | 65 | 16.9 | 16.9 | 16.9 |
| Estefans | 1.00 | 303 | 78.9 | 78.9 | 95.8 |
| Disney | 2.00 | 7 | 1.8 | 1.8 | 97.7 |
| Estefan & Disney | 3.00 | 2 | .5 | .5 | 98.2 |
| Don't know, bongos? | 4.00 | 1 | .3 | .3 | 98.4 |
| Latin/Cuban person | 7.00 | 6 | 1.6 | 1.6 | 100.0 |
| | | ------- | ------- | ------- | |
| | Total | 384 | 100.0 | 100.0 | |

Mode        1.000

Valid cases    384    Missing cases    0

02 Jan 98    DR. DAN SAREL:  BONGOS CUBAN CAFE SURVEY                     Page 5

Q5A       Why do you say that?

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| Heard from someone | 1.00 | 95 | 24.7 | 29.8 | 29.8 |
| From media | 2.00 | 142 | 37.0 | 44.5 | 74.3 |
| Disney property | 3.00 | 6 | 1.6 | 1.9 | 76.2 |
| Estefan related | 4.00 | 31 | 8.1 | 9.7 | 85.9 |
| Know from Miami | 5.00 | 10 | 2.6 | 3.1 | 89.0 |
| Just know it | 6.00 | 24 | 6.3 | 7.5 | 96.6 |
| The name | 7.00 | 1 | .3 | .3 | 96.9 |
| Cuban/Spanish cultur | 8.00 | 4 | 1.0 | 1.3 | 98.1 |
| No answer | 9.00 | 6 | 1.6 | 1.9 | 100.0 |
| | .00 | 65 | 16.9 | Missing | |
| | Total | 384 | 100.0 | 100.0 | |

Mode          2.000

Valid cases     319     Missing cases      65

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q6        Sponsored/associated w. other company?

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| No | 1.00 | 153 | 39.8 | 39.8 | 39.8 |
| D'ont know | 2.00 | 142 | 37.0 | 37.0 | 76.8 |
| Yes | 3.00 | 89 | 23.2 | 23.2 | 100.0 |
| | Total | 384 | 100.0 | 100.0 | |

Mode          1.000

Valid cases     384     Missing cases       0

Q6A       Which company?

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| Disney | 1.00 | 55 | 14.3 | 61.8 | 61.8 |
| Larios | 2.00 | 3 | .8 | 3.4 | 65.2 |
| Coca Cola | 3.00 | 2 | .5 | 2.2 | 67.4 |
| Restaurant group | 4.00 | 2 | .5 | 2.2 | 69.7 |
| Fisher family | 5.00 | 1 | .3 | 1.1 | 70.8 |
| General Mills | 6.00 | 1 | .3 | 1.1 | 71.9 |
| Someone in Miami | 7.00 | 1 | .3 | 1.1 | 73.0 |
| Estefans | 8.00 | 1 | .3 | 1.1 | 74.2 |
| Don't know | 9.00 | 23 | 6.0 | 25.8 | 100.0 |
| | .00 | 295 | 76.8 | Missing | |
| | Total | 384 | 100.0 | 100.0 | |

Mode        1.000

Valid cases      89     Missing cases     295

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q6B       Why do you say that?

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| At Disney property | 1.00 | 55 | 14.3 | 61.8 | 61.8 |
| Own other things | 2.00 | 1 | .3 | 1.1 | 62.9 |
| Menu | 3.00 | 2 | .5 | 2.2 | 65.2 |
| Food place/restauran | 4.00 | 2 | .5 | 2.2 | 67.4 |
| Estefans | 5.00 | 1 | .3 | 1.1 | 68.5 |
| No answer | 9.00 | 28 | 7.3 | 31.5 | 100.0 |
| | .00 | 295 | 76.8 | Missing | |
| | Total | 384 | 100.0 | 100.0 | |

Mode        1.000

Valid cases      89     Missing cases     295

Q7        Business sells other products?

| Value Label | | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|---|
| No | | 1.00 | 239 | 62.2 | 62.2 | 62.2 |
| Don't know | | 2.00 | 100 | 26.0 | 26.0 | 88.3 |
| Yes | | 3.00 | 45 | 11.7 | 11.7 | 100.0 |
| | | Total | 384 | 100.0 | 100.0 | |

Mode        1.000

Valid cases    384    Missing cases    0

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q7A        What other products?

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| Music/entertainment | 1.00 | 27 | 7.0 | 60.0 | 60.0 |
| T-shirts | 2.00 | 1 | .3 | 2.2 | 62.2 |
| Shirts & hats | 3.00 | 1 | .3 | 2.2 | 64.4 |
| Shirts and mugs | 4.00 | 2 | .5 | 4.4 | 68.9 |
| Liquor | 5.00 | 1 | .3 | 2.2 | 71.1 |
| Cuban products/cigar | 6.00 | 2 | .5 | 4.4 | 75.6 |
| Coats & clothes . | 7.00 | 2 | .5 | 4.4 | 80.0 |
| Food | 8.00 | 2 | .5 | 4.4 | 84.4 |
| Bongos | 9.00 | 1 | .3 | 2.2 | 86.7 |
| No answer | 10.00 | 6 | 1.6 | 13.3 | 100.0 |
| | .00 | 339 | 88.3 | Missing | |
| | Total | 384 | 100.0 | 100.0 | |

Mode        1.000

Valid cases    45    Missing cases    339

02 Jan 98    DR. DAN SAREL:   BONGOS CUBAN CAFE SURVEY                    Page 8

Q7B        Where are these products sold?

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| Florida | 1.00 | 2 | .5 | 15.4 | 15.4 |
| At Disney | 2.00 | 2 | .5 | 15.4 | 30.8 |
| At other restaurants | 3.00 | 1 | .3 | 7.7 | 38.5 |
| To the public | 4.00 | 1 | .3 | 7.7 | 46.2 |
| Catering | 5.00 | 1 | .3 | 7.7 | 53.8 |
| Cuba | 6.00 | 1 | .3 | 7.7 | 61.5 |
| Gift shops | 7.00 | 2 | .5 | 15.4 | 76.9 |
| Miami | 8.00 | 2 | .5 | 15.4 | 92.3 |
| Record stores | 9.00 | 1 | .3 | 7.7 | 100.0 |
| | .00 | 371 | 96.6 | Missing | |
| | Total | 384 | 100.0 | 100.0 | |

Mode        1.000

* Multiple modes exist.  The smallest value is shown.

Valid cases      13    Missing cases     371

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q8A        Also visited BCC gift shop?

| Value Label | Value | Frequency | Percent | Valid Percent | Cum Percent |
|---|---|---|---|---|---|
| Yes | 1.00 | 135 | 35.2 | 40.9 | 40.9 |
| No | 2.00 | 195 | 50.8 | 59.1 | 100.0 |
| | .00 | 54 | 14.1 | Missing | |
| | Total | 384 | 100.0 | 100.0 | |

Mode        2.000

Valid cases     330    Missing cases      54

02 Jan 98    DR. DAN SAREL:   BONGOS CUBAN CAFE SURVEY                      Page 9


Q8B       Also visited BCC restaurant?


|             |       | Value | Frequency | Percent | Valid Percent | Cum Percent |
|-------------|-------|-------|-----------|---------|---------------|-------------|
| Yes         |       | 1.00  | 38        | 9.9     | 70.4          | 70.4        |
| No          |       | 2.00  | 16        | 4.2     | 29.6          | 100.0       |
|             |       | .00   | 330       | 85.9    | Missing       |             |
|             |       | Total | 384       | 100.0   | 100.0         |             |

Mode         1.000


Valid cases      54    Missing cases    330


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Q9        Age group


|             |       | Value | Frequency | Percent | Valid Percent | Cum Percent |
|-------------|-------|-------|-----------|---------|---------------|-------------|
| <14         |       | 1.00  | 19        | 4.9     | 4.9           | 4.9         |
| 14-19       |       | 2.00  | 47        | 12.2    | 12.2          | 17.2        |
| 20-29       |       | 3.00  | 63        | 16.4    | 16.4          | 33.6        |
| 30-39       |       | 4.00  | 98        | 25.5    | 25.5          | 59.1        |
| 40-49       |       | 5.00  | 90        | 23.4    | 23.4          | 82.6        |
| 50+         |       | 6.00  | 67        | 17.4    | 17.4          | 100.0       |
|             |       | Total | 384       | 100.0   | 100.0         |             |

Mode         4.000

Valid cases     384    Missing cases      0

Number:_____                                    Location: ☐Restaurant  ☐Gift shop

## Survey

Hi, I am _____ of Barbara Nolan Market Research. We are conducting a short survey today about the business you are now visiting, and would like to ask you a few questions about it.

1. Are you a visitor or a resident of the Orlando area? ☐Visitor  ☐Resident

2. Is this the first time you are visiting this business? ☐Yes ☐No  ☐Don't Know *(don't read answers)*

3. Have you ever heard about this business or this company, before coming in today? *(don't read answers)*
☐No          ☐Don't know/not sure
☐Yes--->If yes:  What exactly did you hear about it before coming in today? Anything else?
_____
_____

4. What was the main reason you came into BONGOS CUBAN CAFE today? _____
_____

5. Could you tell me please, who do you think owns  BONGOS CUBAN CAFE?
_____

**If a specific name is mentioned ask:** Why do you say that? _____
_____
_____

6. Do you think that BONGOS CUBAN CAFE  is sponsored by or is associated with any other company?

☐No *(go to q7)*          ☐Don't know/not sure *(go to q7)*
☐Yes--->If yes which company? _____
_____

**Why do you say that?**_____
_____

7. Do you think this business sells any other products or services other than what is sold here at the restaurant and gift shop?
☐No  *(go to q8, next page)*          ☐Don't know/not sure *(go to q8, next page)*
☐Yes--->If yes, what other products or services? _____
_____
_____

Where are these products and services sold? _____
_____

## Activities

| | |
|---|---|
| 12/11 | Contacted (FR) Internet search |
| 12/12 | Received material, initial review |
| 12/13 | Review |
| 12/15 | Review, video, visited Bardines |
| 12/16 | Tel w. F. Rodriguez |
| 12/18 | Proposal, MR firm contacts |
| 12/22 | Survey approved, library search |
| 12/23 | Survey design |
| 12/24 | Survey approval, implementation |
| 12/26 | Contacts w. MR firm |
| 12/27 | " " |
| 12/28 | " " |
| 12/29 | " ", preparation for computer work |
| 12/30 | Coding, data entry |
| 12/31 | " " |
| 1/2 | Analysis |
| 1/3 | Analysis, report preparation |
| 1/4 | Finalize report |
| 1/5 | Meeting w. F.R., preparation for testimony |
| 1/6 | Preparation for deposition, conference call |

PENGAD-Bayonne, N.J.

EXHIBIT

Sarel #5

Umo 1-7-98

THE
PSYCHOLOGICAL
CORE

THE CONSUMER'S CULTURE

| Regional, Ethnic, and Religious Influences |
| --- |

| Social Class Influences |
| --- |

**AGE, GENDER, AND HOUSEHOLD INFLUENCES**

**AGE INFLUENCES**
• Teens
• Twentysomethings
• Baby boomers
• 50 and older

**GENDER INFLUENCES**
• Changing sex roles
• Differences in acquisition/consumption behaviors

THE
PROCESS OF
MAKING
DECISIONS

**HOUSEHOLD INFLUENCES**
• Types of households
• Household structure
• Household decision-making roles
• Roles of spouses
• Roles of children
• Decision making vs. consumption

| Reference Groups and Social Influence |
| --- |

| Psychographics: Values, Personality, and Lifestyles |
| --- |

**EXHIBIT 14.1**
**Chapter Overview: Age,
Gender, and Household
Influences on Consumer
Behavior**

This chapter shows how factors such as *age*, *gender*, and *household* affect consumer behavior. It examines different age groups (teens, twentysomethings, baby boomers, and 50 and over), sex roles (masculine versus feminine), and types of households. It also discusses changing trends in household structure and how households influence the decision-making process.

cause of its strong symbolism.[7] In fact, clothing establishes an identity and is used as a way of labeling people as "jocks," "the in-crowd," "freaks," or "dweebs."[8]

Teenagers have increasing influence in household purchases, and they have developed fairly sophisticated decision-making skills. In fact, due to an increasing number of working parents and divorces, today's teens often shop for themselves and are responsible for more decisions than any previous generation.[9] In these roles, they are thrifty and savvy shoppers.[10] They are very particular about how they spend their money and will shop extensively for sales and bargains. Teens tend to do more shopping on weekends. Females tend to shop more than males. Friends are also a major source of information on products and services, and socializing with them is one of the major reasons that teens like to shop. Similarly

EXHIBIT

Sarel #6

PENGAD-Bayonne N.J.

NMG 1-7-98

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

**MICHAEL CARUSO & CO., INC.** )
                )
     Plaintiff,      )
                )
v.                  )      CIVIL ACTION NO.
                )      Magistrate Judge
**ESTEFAN ENTERPRISES, INC. and** )
**BONGOS CUBAN CAFE, INC.,** )
                )
     Defendants.   )
_____ )

STATE OF CALIFORNIA   )
                    )
COUNTY OF LOS ANGELES  )

### AFFIDAVIT OF BRIAN L. KAIL

Before me, the undersigned authority, personally appeared **BRIAN L. KAIL**, who being known to me and being duly sworn, deposes and says as follows:

1.    My name is **BRIAN L. KAIL**. I am now and since 1991 have been the President of plaintiff **MICHAEL CARUSO & CO., INC.** ("Caruso"). From 1986 when I first joined Caruso to 1991 when I became President, I was a sales executive for the company. The matters to which I hereafter depose are within my personal knowledge or are matters on which I have informed myself from the regularly maintained records of Caruso, except where stated to be on information and belief.

2.    Caruso is a California corporation formed in 1982 by two individuals, Michael Caruso and Gene Montesano, for the purpose of designing, manufacturing and selling at wholesale junior jeans and sportswear. In need of a catchy name under which to market the jeans and other clothing items, Mr. Caruso was inspired by his fondness


EXHIBIT
Sarel #7
Nmg 1-7-98

for the Maynard G. Crebbs character in the 1950's sitcom "Dobie Gillis," and hearing the song "We've Got the Beat" by the Go-Go's, to brand the products with the name *BONGO*.

3.     From its modest beginnings in 1982 with a single showroom/warehouse in Los Angeles, Caruso expanded its operations and in 1991 opened a second showroom in New York City.  Today, the *BONGO* clothing line manufactured by Caruso is sold worldwide, and has evolved into a full line of babies, children's, junior sportswear and adult clothing for men and women.  As will be stated in greater detail later, the *BONGO* mark has been used prominently, continuously and exclusively by Caruso on all of its products since 1982 to the present.   Since Caruso's first shipment of *BONGO* merchandise, Caruso's wholesale sales have been more than $770,000,000, representing a retail value in excess of $1.5 billion.

4.     Caruso is the owner of certificates of registration, issued under the authority of the Commissioner of the United States Patent and Trademark Office, for the following trademarks:

| Registration No. & Registration Date | Trademark | Goods |
|---|---|---|
| 1,331,004 April 16, 1985 | *BONGO* | clothing - - namely, pants, jeans, skirts, shirts, blazers, jackets, vests, jumpsuits and blouses. |
| 1,500,609 August 16, 1988 | *B BONGO* (stylized) | clothing — namely, pants, skirts, blouses and jackets. |
| 1,895,168 May 23, 1995 | *BONGO BY GENE MONTESANO* | clothing — namely, pants, jeans, skirts, shirts, blazers, jackets, vests, jumpsuits, blouses, shorts, dresses, overalls and caps. |
| 1,898,168 June 6, 1995 | *BABY BONGO* | clothing — namely, tops, shirts, overalls, rompers, jeans, skirts, shorts, jackets, vests and dresses. |
| 1,193,168 | *Miscellaneous* | clothing — namely, shirts. |

2

| | | |
|---|---|---|
| January 30, 1996 | *Design*<br>*(bongo drums)* | |
| 1,960,546<br>March 5, 1996 | *BONGO* | tote bags and back packs. |
| 1,947,123<br>May 14, 1996 | *BONGO* | footwear, namely, athletic shoes,<br>walking shoes and dress shoes. |

The foregoing trademarks are hereinafter referred to as the "Caruso Trademarks." True and correct copies of the certificates of registration of the Caruso Trademarks are attached hereto as Exhibit "A." Each of the Caruso Trademarks is valid and subsisting. The first two of the above identified Caruso Trademarks have achieved incontestible status.

5. The Caruso Trademarks are prominently affixed to each and every article of clothing and promotional merchandise that originates from Caruso. Over the years, Caruso has accumulated hundreds of different specimens utilizing the Caruso trademarks, and it is therefore impracticable to attempt to offer into evidence by this affidavit each such specimen. A representative sampling of the clothing items and promotional materials manufactured by or for Caruso onto which the Caruso Trademarks are affixed will be presented to the Court at the time of the hearing on Caruso's Motion for Preliminary Injunction. For purposes of this affidavit, however, the following specimens are offered by the following exhibit references:

> Exhibit "B": a sampling of wasteband patches (Caruso presently uses at least 80 different styles and colorations of patches) which are affixed to jeans and other bottoms, and a sampling of pocket flashers which are attached to the back pocket of each pair of jeans;

> Exhibit "C": photocopies of screens originated and used by Caruso over

3

the past two or three years (there have been many hundreds
of such screens originated and used since 1982) to produce
T-shirts;

Exhibit "D":  photographs of a sampling of jeans, shorts, skirts, shirts, vests,
jackets and caps bearing the Caruso Trademarks;

Exhibit "E":  a sampling of decals and postcards used for promotional
purposes; and

Exhibit "F":  photographs of promotional items used by Caruso over the
years, such as key chains, pens, friendship bracelets, slinkys,
towels, hairbrushes, and tote bags.

6.    The Caruso product line today consists of the following classifications of
goods for baby girls, young and pre-teen girls, juniors and women:  jeans, shorts, shirts,
skirts, vests, jackets, dresses, overalls, t-shirts (embroidered and screened), novelty knits,
sweatshirts, caps, tote bags and backpacks.  Caruso's line of clothing for baby boys,
young boys and mens consists of jeans, shorts, shirts, vests, jackets, t-shirts
(embroidered and screened), novelty knits, sweatshirts, and caps.

7.    Caruso distributes its *BONGO* products principally through traditional retail
channels such as department stores, specialty stores and boutiques.  In Florida, Caruso
sells its products in well known department stores such as Burdines and J.C. Penney,
and popular specialty stores such as Bealls, Uptons, and the Body Shop.  In addition,
Caruso markets its *BONGO* products directly to the consumer through a toll-free 888
number (1-888-41-BONGO), and more recently by the internet using our website
(www.BONGOJEANS.com).  By the end of the year, Caruso will be marketing directly to
the consumer by catalogue sales.

4

8.    Over the years, Caruso has crafted and image for the *BONGO* brand and the products sold under the Caruso Trademarks targeting the following consumer groups:

| Classification | Target Age Group |
|---|---|
| baby girls | 25 - 45 |
| young and pre-teen girls | 7 - 14 |
| junior and womens fashions | 15 - 25 |
| baby boys | 25 - 45 |
| young and pre-teen boys | 7 -14 |
| mens fashions | 15 - 25 |

9.    I have reviewed a product classification report which I requested Caruso's Chief Financial Officer to run for the years 1993 through 1996 (1997 is incomplete) for purposes of testifying in this affidavit as to the percentage breakdown by product category of Caruso's annual sales. Thus, Caruso's sales of each product category, by percentage, for the years 1993, 1994, 1995 and 1996, were as follows:

| Year | Product Category | Percentage |
|---|---|---|
| 1993 | jeans | 56.0 |
| | shorts | 23.9 |
| | shirts | 2.3 |
| | skirts | 2.3 |
| | dresses | 1.0 |
| | overalls | .1 |
| | vests | 1.0 |
| | jackets | .1 |
| | t-shirts | 6.2 |
| | knit tops | 4.7 |
| | logo sweatshirts | 1.3 |
| | screened or embroidered sweatshirts | 1.3 |
| | miscellaneous (caps, bags, etc.) | .1 |
| 1994 | jeans | 51.4 |
| | shorts | 22.2 |
| | shirts | 2.2 |
| | skirts | 1.9 |
| | dresses | 2.5 |
| | overalls | .3 |
| | vests | 3.7 |

5

|  | jackets | .1 |
|---|---|---|
|  | t-shirts | 7.1 |
|  | knit tops | 5.5 |
|  | logo sweatshirts | .6 |
|  | screened or embroidered sweatshirts | 2.3 |
|  | miscellaneous (caps, bags, etc.) | .3 |
| 1995 | jeans | 46.1 |
|  | shorts | 22.0 |
|  | shirts | 1.4 |
|  | skirts | 4.9 |
|  | dresses | 2.1 |
|  | overalls | .2 |
|  | vests | 3.8 |
|  | jackets | .4 |
|  | t-shirts | 10.7 |
|  | knit tops | 6.4 |
|  | logo sweatshirts | .2 |
|  | screened or embroidered sweatshirts | 1.5 |
|  | miscellaneous (caps, bags, etc.) | .2 |
| 1996 | jeans | 49.9 |
|  | shorts | 22.4 |
|  | shirts | 1.0 |
|  | skirts | 3.6 |
|  | dresses | 1.2 |
|  | overalls | .1 |
|  | vests | 1.7 |
|  | jackets | .1 |
|  | t-shirts | 8.8 |
|  | knit tops | 11.5 |
|  | logo sweatshirts | .2 |
|  | screened or embroidered sweatshirts | .1 |
|  | miscellaneous (caps, bags, etc.) | .1 |

10.    I have reviewed a customer report which I requested Caruso's Chief Financial Officer to run for the years 1993 through 1996 (1997 is incomplete) for purposes of determining the percentage of Caruso's annual worldwide sales represented by sales to accounts in the State of Florida. That report confirmed what I expected the case to be which is that a disproportionately large percentage of Caruso's annual sales are to accounts in Florida, and that percentage is steadily growing:

6

| Year | Sales | Percentage | Rank |
|------|-------|------------|------|
| 1993 | $11,810.000 | 13% | 2d |
| 1994 | $20,758,000 | 19% | 2d |
| 1995 | $25,813,000 | 24% | 2d |
| 1996 | $25,615,000 | 27% | 1st |

Based on the substantial presence of Caruso's product in Florida I am of the opinion and believe that the *BONGO* mark is well and favorably known in the Latin Community, and has been for at least several years.

11.    Over the years, Caruso has extensively advertised the Caruso Trademarks in print media, in such nationally prominent magazines as <u>Glamour</u>, <u>Seventeen</u>, <u>Teen</u>, <u>ELLE</u>, <u>Young Miss ("YM")</u>, <u>Cosmopolitan</u>, <u>Vanity Fair</u>, <u>Mademoiselle</u>, and <u>Jane</u>. A sampling of Caruso's national print advertising is attached hereto and collectively identified as Exhibit "G."  In addition to the national print media, Caruso regularly participates in cooperative advertising with some of its larger accounts.  Two examples of such co-op advertising with Burdines are attached hereto and collectively identified as Exhibit "H."  Caruso has also regularly advertised its products and the Caruso Trademarks on billboards, radio and on broadcast and cable (MTV) television.  A video tape depicting some of Caruso's recent television spots is attached hereto as Exhibit "H." Since just 1993, Caruso has expended nearly $15 million advertising its products and the Caruso Trademarks.

12.    In addition to traditional forms of advertising Caruso has made a regular practice of promoting the *BONGO* trademark by donating clothing to charitable organizations such as United Way, Para los Niños, Planet Hope, Una Cita Con Dios, and numerous religious groups, to name but a few.  In addition, Caruso has regularly

7

sponsored charitable events such as AIDS dance-a-thons and walk-a-thons and contributed to charitable organizations such as the American Cancer Society, the American Heart Association, YMCA, youth soccer, the Boy Scouts, police organizations, Childrens' Hospital, and the City of Hope. Since 1993, alone, Caruso has donated well over $200,000 in money and clothing in connection with these promotional activities.

13. The Caruso Trademarks have achieved such widespread and favorable recognition that Caruso has been able to enter beneficial trademark licensing arrangements with third parties such as Candie's Shoes, and is presently negotiating licensing arrangements with manufacturers of eyewear and junior accessories, and is considering licensees for underwear and cosmetics. In this regard, Caruso has applications pending before the Patent and Trademark Office to register the Caruso trademarks for these classes of goods. Caruso is also quite proud of the fact that it made a licensing agreement with Mattel Toys, as a result of which *BONGO* was the first junior line ever worn by the famous "Barbie" dolls. A true and correct copy of a depiction of the "*BONGO* Barbie" topper is attached hereto as Exhibit "I."

14. Caruso has been the only company to use the Caruso Trademarks on clothing items and it is my opinion and belief that the significance of the Caruso Trademarks will be materially compromised, hence the value to third parties of a license from Caruso to use the Caruso Trademarks on other goods, will be substantially reduced if defendants are permitted to use the offending mark *"BONGOS Cuban Cafe"* as Caruso will no longer be able to offer to such third parties the exclusive right to use the *"BONGO"* mark.

15. The Caruso Trademarks, and the goodwill associated therewith, are by far Caruso's most valuable and important assets, and Caruso has been steadfast in policing

8

the Caruso Trademarks to prevent infringing uses of the same or similar marks by others. For many years now through the offices of its trademark attorney, Harvey S. Hertz, Caruso has maintained a trademark watch service to report to us the existence of any application for trademark registration that is published for opposition in the United States (and elsewhere throughout the world) where the mark is or includes the word "bongo" or any derivative thereof. As a consequence of the watch service Caruso was advised in 1995 that the someone sought to register the mark "BINGO BANGO BONGO" for clothing, and Caruso was successful in persuading the registrant to withdraw the application. Similarly, in 1995 we resolved a dispute with Bongo Entertainment, Inc. to withdraw our opposition to its application to register the mark "BONGO COMICS GROUP" on condition that it not use the mark on any t-shirts, hats, or other articles of clothing in connection with its comics, or otherwise. Last year, a company by the name of Local Motion, Inc. sought to register the mark "BONGA" for swim trunks, caps, and t-shirts to be sold at surf shops. Caruso opposed that effort, which resulted in the registrant agreeing to change its mark to the full name of a well known surfer "BONGA PERKINS."

16.     Most recently, on Caruso's behalf, Mr. Hertz ordered a full trademark search report from Thomson & Thomson in connection with a proceeding Caruso initiated in the Patent and Trademark Office to oppose the registration of the mark "BONGO" for computer software. Upon receipt of that report Caruso learned for the first time that defendant Estefan Enterprises, Inc. had several pending applications to register the mark "BONGOS CUBAN CAFE" and "BONGO'S CUBAN CAFE" for intended use in connection with clothing. At my instruction Mr. Hertz immediately sent a letter, dated August 28, 1997, to defendant Estefan Enterprises, Inc. advising it of Caruso's prior and superior rights in and to the Caruso Trademarks, particularly the mark "BONGO," and insisting that

Estefan Enterprises abandon its intentions to use the mark.  Counsel for Estefan Enterprises promptly responded to Mr. Hertz' letter, expressing their opinion to the effect that the intended use by Estefan Enterprises of the "BONGOS CUBAN CAFE" mark was not an infringement of Caruso's rights.  By the content and tone of this response letter, and the realization from the cover article in the September 22, 1997 issue of Forbes that Estefan Enterprises had invested $5 million into its restaurant which was to open in a matter of days, I determined that Estefan Enterprises could not amicably be persuaded to alter its plans about using the "BONGOS" mark.  I thereupon instructed Caruso's counsel to initiate these proceedings.  True and correct copies of the Hertz letter of August 28, 1997 and of the response from counsel for Estefan Enterprises dated September 3, 1997 are attached hereto and collectively identified as Exhibit "J."

17.    I am of the opinion and firm belief that defendants' use of the mark "BONGOS Cuban Cafe" will inevitably cause confusion between Caruso's products and defendants' restaurant services and the clothing and other merchandise sold at the restaurant.  I understand from the Forbes article that the now opened restaurant in Orlando is but the first of many "BONGOS Cuban Cafe" restaurants which defendants plan to open.  I also understand that on virtually each clothing and souvenir item sold by defendants, the word "BONGOS" is prominently emphasized while the words "Cuban Cafe" are accorded much less significance.  As a result, I would expect that defendants' food patrons as well as customers of defendants' clothing and other souvenir merchandise, and others who observe people wearing defendants' clothing on the streets (particularly in Florida), may well be confused into thinking that defendants' restaurant and merchandise are somehow affiliated with Caruso.  Such confusion would necessarily, perhaps substantially, dilute and depreciate the value of the Caruso Trademarks, and the

10

reputation and goodwill assiduously developed by Caruso over the past 15 years. Worse yet, if defendants' offending use of the mark *"BONGOS"* is not stopped and defendants expand as contemplated, with the (well-deserved) popularity of Gloria Estefan and the success of her restaurants, I am concerned that in a few short years people may come to identify the mark *"BONGOS"* with defendants instead of Caruso. If that were to happen, Caruso would effectively be out of business.

**FURTHER AFFIANT SAYETH NAUGHT**

_____
Brian L. Kail

SWORN TO AND SUBSCRIBED before me this __23rd__ day of September, 1997, at Vernon, California.

_____
(signature of notary public)

C T VLORIA
Commission #1094537
Notary Public — California
Los Angeles County
My Comm. Expires Apr 14,2000

# Interviewer Instructions

*Please read and sign below*

**Overall Instructions**

1. This is a very important job. Make sure it is conducted at the highest professional level. Read questionnaire carefully and become familiar with each question.

2. You will be stationed inside the BONGOS CUBAN CAFE at downtown Disney, West Side. This is on a Disney property and you need to follow all the Disney rules.

3. You will be interviewing customers a) immediately after they finished eating or shopping at the gift shop, b) while they are waiting inside the restaurant, **before** they are seated.

4. Sampling instructions:
I. Approach the first person available in the location stated in 3 above
II. If the person refuses to participate, record, and ask the next available person
III. If you approach adults, alternate between males and female respondents
VI. If you approach parties that include teenaged kids (over 13 years old), alternate between adults and teenaged kids. Among teenaged kids alternate between males and females.
V. 90% of the time should be allocated to interviews at the restaurant, 10% for interviews at the gift shop

5. Please keep a log of the non-participation figures

**Questionnaire Instructions**

1. Never lead or suggest an answer. Don't deviate from questionnaire wording, don't explain questions in your own words. Simply re-read the question.

2. Only question 9 (the age question) calls for you to provide (read) the answer categories. In all other questions you are **not** supposed to read the answers. Read only the questions.

3. Record open-ended questions exactly as answered by respondents. Don't interpret the answer.

4. Question 6 Skip pattern: Only people saying "yes" are asked the follow up questions. All others go to question 7.

5. Question 7 Skip pattern: Only people saying "yes" are asked the follow up questions. All others go to question 8.

6. Every questionnaire should include the following information:
a. survey number
b. marked location (either Restaurant or Gift Shop)
c. Date of interview (e.g. 12/27)
d. Time of completion (e.g. 11:01am, 7:24 pm)
e. Your name
f. Your signature to verify accuracy

I, _____ (insert name), have carefully read and understood all these instructions. I was given the opportunity to ask questions and clarify all issues. I pledge to conduct this survey according to these instructions and to act in the most professional manner.

Signature:_____ DATE: _____



1. This is a very important job. Make sure it is conducted at the highest professional level. Read questionnaire carefully and become familiar with each question.

2. You will be stationed inside the BONGOS CUBAN CAFE at downtown Disney, West Side. This is on a Disney property and you need to follow all the Disney rules.

3. You will be interviewing customers a) immediately after they finished eating or shopping at the gift shop, b) while they are waiting inside the restaurant, before they are seated.

4. Sampling instructions:
I. Approach the first person available in the location stated in 3 above
II. If the person refuses to participate, record, and ask the next available person
III. If you approach adults, alternate between males and female respondents
VI. If you approach parties that include teenaged kids (over 13 years old), alternate between adults and teenaged kids. Among teenaged kids alternate between males and females.
V. 90% of the time should be allocated to interviews at the restaurant, 10% for interviews at the gift shop

5. Please keep a log of the non-participation figures

Questionnaire Instructions
1. Never lead or suggest an answer. Don't deviate from questionnaire wording, don't explain questions in your own words. Simply re-read the question.

2. Only question 9 (the age question) calls for you to provide (read) the answer categories. In all other questions you are not supposed to read the answers. Read only the questions.

3. Record open-ended questions exactly as answered by respondents. Don't interpret the answer.

4. Question 6 Skip pattern: Only people saying "yes" are asked the follow up questions. All others go to question 7.

5. Question 7 Skip pattern: Only people saying "yes" are asked the follow up questions. All others go to question 8.

6. Every questionnaire should include the following information:
a. survey number                                          d. Time of completion (e.g. 11:01am, 7:24 pm)
b. marked location (either Restaurant or Gift Shop)       e. Your name
c. Date of interview (e.g. 12/27)                         f. Your signature to verify accuracy

I, _____ (insert name), have carefully read and understood all these instructions. I was given the opportunity to ask questions and clarify all issues. I pledge to conduct this survey according to these instructions and to act in the most professional manner.

Signature: _Ruth E. Keith_ DATE: _12-27-97_
_12-29-97_

_Chris Grady_

_Jeanne Botz_

_Lyn Ellison_

_Margie Newman_

_Sandra Winthrobe_

_Brian Kacey_

EXHIBIT
Jerel #9
NMB 1-7-98

FAX MEMORANDUM

FROM:      Dr. Dan Sarel

TO:        Ruth Kent

DATE:      12.24.97

RE:        Disney interviews

1. Attached a) survey (2 pages)
          b) interviewer instructions (1 page)

2. Please make 500 copies for this weekend

3. See sampling instructions in the Interviewer Instructions. We will discuss details over the phone.

4. Interview location:
    BONGOS CUBAN CAFE
    Located at DOWNTOWN DISNEY West Side
    It is at the east central portion of the Disney resort at the intersection of Buena Vista
    Drive and Hotel Plaza Blvd.

5. Contact person: Jack Hilan (manager of the restaurant) tel: 407- 850-6999
                   Beeper: 407- 827 7000

6. After the training session on Saturday, please make sure that every interviewer signs the
Interviewer Instruction sheet.

7. It is important to keep an accurate log of the non-response rate (refusal data).

I'll call you on Friday morning at home. If you have any questions please call me at home:
305-2516005, or in my car at 305-812-1221

Have a great holiday!



EXHIBIT
Sarel #10
NMG 1-7-98

NAME OF STUDY: _____

JOBNUMBER: _____  DATE: _____

| PHONE # 12/27 | NAME | 12/28 | Cum | 12/29 | Cum | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Reg. | 92 | 110 | 202 | 132 | 334 | | | | |
| Gift | 40 | 1 | 41 | 9 | 50 | | | | |
| | | | | | | | | | |
| Under 14 | 5 | 12 | 17 | 3 | 20 | | | | |
| 14-19 | 14 | 21 | 35 | 11 | 46 | | | | |
| 20-29 | 22 | 17 | 39 | 24 | 63 | | | | |
| 30-39 | 36 | 26 | 62 | 36 | 98 | | | | |
| 40-49 | 30 | 23 | 53 | 37 | 90 | | | | |
| 50+ | 25 | 12 | 37 | 30 | 67 | | | | |
| | | | | | | | | | |
| Males | 66 | 46 | 112 | 87 | 199 | | | | |
| Females | 66 | 65 | 131 | 54 | 185 | | | | |
| | | | | | | | | | |
| Completes | 132 | 111 | 243 | 141 | 384 | | | | |
| | | | | | | | | | |
| Ref. | 16 | 46 | 62 | 59 | 121 | | | | |
| L/A | 9 | 10 | 19 | 23 | 42 | | | | |
| | | Corrected | | | | | | | |



EXHIBIT
Jarel #11
NMG 1-7-98

Codes

3.a
    1. Gloria Estefan and/or  Emilio Estefan
    2. Media (articles, TV, ads)
    3. Word of mouth (friends, relatives, etc.)
    4. Comments about the restaurant
    5. Saw in the past

4.
    1. Eat/drink
    2. Cuban (food, music, heritage)
    3. Because of others (friends, family, etc.)  -> I did not decide
    4. Came to see place, check it out
    5. Was in the area, looked interesting
    6. Something to do, family outing, meet people (Bongos not mentioned as main reason)
    7. To buy bongos
    8. Estefans
    9. Buy souvenirs/gifts

5.
    1. Estefans (Gloria and/or Emilio)
    2. Disney
    3. Estefan & Disney
    4. DK, Bongos
    5. Bongos
    6. Bongo
    7. Latin/Cuban person

5a.
    1. Heard from someone
    2. From media (all media)
    3. Disney property, location
    4. Know Estefans, like Estefans, Estefans own other restaurants
    5. Know from Miami
    6. I know it, it's true (without explanations)
    7. The name
    8. Cuban/Latin culture

6a.
    1. Disney
    2. Larios
    3. Coca Cola
    4. Restaurant group
    5. Fisher Family
    6. General Mills
    7. Someone in Miami
    8. Estefans

6b.
    1. At Disney (property, location)
    2.  Own other things
    3. Menu
    4. Food place/restaurant
    5. Estefans



EXHIBIT
Sarel #13
NMG 1-7-98

7a.   1. Music
       2. T-shirts
       3. Shirts & hats
       4. Shirts and mugs
       5. Liquor
       6. Cuban products/cigars
       7. Coat & clothes
       8. Food
       9. Bongos

7b. 1. Florida
       2. At Disney
       3. At other restaurants
       4. To the public
       5. Catering
       6. Cuba
       7. Gift shops
       8. Miami
       9. Records stores